WALTER WILHELM LAW GROUP
a Professional Corporation
Riley C. Walter #91839
Michael L. Wilhelm #101495
Matthew P. Bunting #306034
205 E. River Park Circle, Suite 410
Fresno, CA 93720
Telephone:   (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:      rileywalter@W2LG.com
             mwilhelm@W2LG.com

Attorneys for Debtor in Possession

(SPACE BELOW FOR FILING STAMP ONLY)

## IN THE UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| In re | CASE NO. 17-12389-A-11 |
|---|---|
| DON ROSE OIL CO., INC., a California corporation; | Chapter 11 |
| Debtor. | DC No.: WW-1 |

Tax ID #:  94-2287631
Address:   205 N. Ben Maddox Way
           Visalia, CA 93292

Date:     June 26, 2017
Time:     2:00 PM
Place:    2500 Tulare St.
          Fresno, CA 93721
          Courtroom 11, 5th Floor
Judge:    Honorable Fredrick E. Clement

## EXHIBITS TO MOTION FOR
## AUTHORITY TO USE FACTORING FINANCING

| Exhibit | Description | # of Pages | Starting Page # |
|---|---|---|---|
| A | Accounts Sale and Purchase Agreement | 18 | 1 |
| B | Bridge Loan Addendum to Accounts Sale and Purchase Agreement | 4 | 19 |
| C | Cash Flow Addendum to Accounts Sale and | 4 | 23 |

| | Purchase Agreement | | |
|---|---|---|---|
| D | Inventory Loan Addendum to Account Sale and Purchase Agreement | 18 | 27 |
| E | Term Loan Addendum to Accounts Sale and Purchase Agreement | 4 | 45 |
| F | Budget of Don Rose Oil, Inc. (6/23/17–7/14/17) | 1 | 49 |

Dated: June 23, 2017

WALTER WILHELM LAW GROUP,
a Professional Corporation

By: _____

Michael L. Wilhelm,
Attorneys for Debtor in Possession

**SALLYPORT COMMERCIAL FINANCE, LLC**

*ACCOUNTS SALE AND PURCHASE AGREEMENT*

THIS ACCOUNTS SALE AND PURCHASE AGREEMENT (this "Agreement") is entered into in Houston, Texas, between Sallyport Commercial Finance, LLC ("Sallyport"), with offices at 14100 Southwest Freeway, Suite 210, Sugar Land, Texas 77478 and Don Rose Oil Co., Inc., a California corporation ("Borrower"), whose office is located at 205 N. Ben Maddox Way. Visalia, CA 93292 ("Borrower's Address").

R E C I T A L S:

A.   WHEREAS, Borrower was previously indebted to Siena Funding LLC, a Delaware limited liability company ("Siena") pursuant to the documents referenced on Exhibit "A" attached hereto (the "Siena Documents") pursuant to which Siena made loans (the "Loan") to Borrower secured by certain assets of Borrower. The amounts due under the Siena Documents are guaranteed by each of Castle Energy, Inc. ("Castle"), John Castellucci ("John"), Linda Castellucci ("Linda"), Robert Moore ("Robert"), Donald Rose ("Donald") and Janice Rose ("Janice") (each individually a "Guarantor" and collectively the "Guarantors"). The amounts due under the Siena Documents are also supported by a pledge of certain assets of Castle, Donald, Janice, Robert, Debora Moore ("Debora") and Joseph Rocha ("Joseph") (each a "Pledgor" and collectively the "Pledgors") pursuant to a Collateral Pledge Agreement dated June 30, 2015, as amended, modified or supplemented from time to time (the "Collateral Pledge Agreement"). In furtherance of the Collateral Pledge Agreement, each of Pledgors provided Siena with a Pledge Instruction directing Siena to honor their respective pledge of their shares to Siena as collateral for the Loan and Borrower acknowledged the pledge of their respective shares to Siena and agreed to comply with any instruction of Siena with respect to said pledged shares.

B.   WHEREAS, pursuant to that certain Assignment and Assumption Agreement dated ~~January~~ *February* 22 2017, (the "Siena Assignment") Siena sold, transferred and assigned to Sallyport all of Siena's right, title and interest in and to the Siena Documents and the rights and obligations evidenced therein (the "Siena Obligations") to Sallyport on the terms set out therein. In furtherance of the Siena Assignment, Siena filed UCC-3 assignments as reflected on the attached Schedule of UCC-3 Assignments in the office of the California Secretary of State which assignment evidenced the transfer of Siena's UCC-1 Financing Statements referenced therein to Sallyport.

C.   WHEREAS, all other Collateral pledged to Siena by any party as referenced in any of the Loan Documents, was assigned to Sallyport as reflected in the attached Schedule of Collateral Assignments.

D.   WHEREAS, as a result of the Siena Assignment to Sallyport, Borrower is indebted to Sallyport pursuant to the terms set forth in the Siena Documents, Guarantors guaranty the amounts due Sallyport from Borrower pursuant to the Siena Documents and the Pledge of shares by the Pledgors continue to support the amounts due Sallyport pursuant to the Siena Documents.

E.   WHEREAS, Sallyport and Borrower each desire to amend and restate the Loan and Security Agreement in its entirety and Guarantors and Pledgors consent to such amendment and restatement of the Loan and Security Agreement, all in accordance with and pursuant to the terms and conditions contained in this Agreement, effective as of the date hereof.

NOW, THEREFORE, in consideration of the premises and of the promises, mutual covenants and conditions herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   **Definitions and Index to Definitions.** The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have that meaning as set forth in the Uniform Commercial Code as enacted in the State of Texas (the "UCC").

1.1   **"Accounts"** – shall have the meaning as set forth in the UCC, plus all contract rights, documents, notes, instruments and all other forms of obligations owed to or owned by Borrower, all general intangibles relating thereto, all proceeds thereof, all guaranties, supporting obligations and security therefore, and all goods and rights represented thereby and arising therefrom, including, but not limited to, returned, reclaimed and repossessed goods and the rights of stoppage in transit, replevin and reclamation.

1.2   **"Account Payment"** means that portion of the purchase price paid by Sallyport to Borrower from time to time purchased for the Accounts purchased hereunder.

1.3   **"Account Payment Base"** means an amount equal to the Advance Rate multiplied by the Eligible Accounts, each as determined by Sallyport from time to time in its sole and absolute discretion.

1.4   **"Account Debtor"** means the person or entity which is obligated on an Account, together with anything else defined as an "account debtor" in the UCC.

1.5   **"ACH"** – the Automated Clearing House.

1.6   **"Advance Rate"** – See Schedule A, No. 1.

1.7   **"Affiliate"** means with respect to any person or entity in question, any other person or entity owned or controlled by, or which owns or controls or is under common control or is otherwise affiliated with such person or entity in question.

1.8   **"Audit Fee"** – See Schedule A, No. 2.

1.9   **"Availability Pool"** means, at the time of determination thereof, the maximum amount available for an Account Payment to Borrower, as determined in accordance with the Availability Certificate.



EXHIBIT  A
Page  1  of  19

1.10 **"Availability Certificate"** means a certificate in the form of Schedule A attached hereto duly executed by an authorized officer of Borrower or such other document in form acceptable to Sallyport in Sallyport's sole discretion.

1.11 **"Avoidance Claim"** – means the assertion, complaint, judgment or otherwise against Sallyport, any payment Sallyport received with respect to any Account, whether the amount related thereto was paid by the Account Debtor, the Borrower, on behalf of Borrower or for its benefit, or any lien granted to Sallyport is avoidable (or recoverable from Sallyport) under the Bankruptcy Code, any other debtor relief statute, including, but not limited to, preference claims, fraudulent transfer claims, or through receivership, assignment for the benefit of creditors or any equivalent recovery law, rule or regulation which relates to the adjustment of debtor and creditor relations.

1.12 **"Base Rate"** – The highest prime rate publically announced from time to time by The Wall Street Journal as its prime or base rate or equivalent rate, or if The Wall Street Journal ceases to publish the prime rate, such other published prime rate as chosen by Sallyport, in its sole discretion.

1.13 **"Collateral"** – all of Borrower's now owned or hereafter acquired Accounts, Equipment, Inventory, Financial Assets, Chattel Paper, Electronic Chattel Paper, Letters of Credit, Letter of Credit Rights, General Intangibles, Investment Property Goods, Deposit Accounts, Instruments, the Reserve, Commercial Tort Claims, Supporting Obligations, motor vehicles, Good Will relating to any of the foregoing, all books, records, files and computer data related to the foregoing, and all proceeds of the foregoing. Collateral shall include, but not be restricted to, the assets described on the attached Schedule of Collateral.

1.14 **"Daily Balance"** – The aggregate total of Account Payments made to Borrower as advances of the Purchase Price relating to Purchased Accounts which remain unpaid.

1.15 **Intentionally left blank**

1.16 **"Default Rate"** – See Schedule A, No. 3.

1.17 **"Dispute"** - any dispute, deduction, claim, offset, defense or counterclaim of any kind whatsoever, real or imagined, regardless of whether the same is in an amount greater than, equal to or less than the Account concerned, regardless of whether the same is valid or bona fide, regardless of whether the same in whole or in part relates to the Account on which payment is being withheld or other Accounts or goods or services already paid for, and regardless of whether the same arises by reason of an act of God, civil strife, war, currency restriction, foreign political restriction or regulation, or the like, or any other reason.

1.18 **"Effective Date"** – See signature page.

1.19 **"Eligible Accounts"** – an Account which is acceptable for an advance of the Purchase Price as determined by Sallyport, in its sole discretion.

1.20 **"Environmental Laws"** – any federal, state or local law, rule, regulation or order relating to pollution, waste disposal, industrial hygiene, land use or the protection of human health, safety, or welfare, plant life or animal life, natural resources, the environment or property.

1.21 **"Events of Default"** – shall have that meaning as set forth in Section 7.1 herein.

1.22 **"Initial Setup Fee"** See Schedule A, No. 4.

1.23 **"Invalid Invoice Fee"** – fifteen percent (15%) of the face amount of any purchased Account or $1,000.00, whichever is higher, as liquidated damages for failure to comply with Section 4.6(a) herein.

1.24 **"Management Fee"** – See Schedule, No. 14.

1.25 **"Maximum Facility Limit Amount"** – See Schedule A, No. 5.

1.26 **"Minimum Monthly Sales Shortfall Fee"** – See Schedule A, No. 6.

1.27 **"Minimum Monthly Sales Volume"** – See Schedule A, No 7.

1.28 **"Missing Notation Fee"** – fifteen percent (15%) of the face amount of any purchased Account, or $1,000.00 the higher thereof, as liquidated damages for failure to comply with Section 2.7.

1.29 **"Misdirected Payment Fee"** – fifteen percent (15%) of the amount of any payment on account of a purchased Account, or $1,000, the higher thereof which has been received by Borrower and not delivered to Sallyport on the business day following receipt by Borrower.

1.30 **"Obligations"** – shall mean and include each and all of the following: the obligation to pay and perform when due all debts and all obligations, liabilities, covenants, agreements, guaranties, warranties and representations of Borrower to Sallyport, of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable from Borrower to Sallyport; howsoever created, incurred, acquired, arising or evidenced; whether primary, secondary, direct, absolute, contingent, fixed, secured, unsecured, or otherwise; whether as principal or guarantor; liquidated or unliquidated; certain or uncertain; determined or undetermined; due or to become due; as a result of present or future advances or otherwise; joint or individual; pursuant to or caused by Borrower's breach of this Agreement, or any other present or future agreement or instrument, or created by operation of law or otherwise; evidenced by a written instrument or oral; created directly between Sallyport and Borrower or owed by Borrower to a third party and acquired by Sallyport from such third party; monetary or nonmonetary.

EXHIBIT A
Page 2 of 18

1.31    **"Online Reporting Service"** – shall mean the system set up on Sallyport's website where Borrower provides Sallyport with the pertinent data necessary for Sallyport to purchase Accounts under this Agreement and otherwise administer this Agreement.

1.32    **"Online Statement of Account"** – shall have that meaning as described in Section 2.8 herein.

1.33    **"Original Term"** – shall mean the term of this Agreement commencing on the Effective Date and concluding within the time frame as provided for in Schedule A, No. 8.

1.34    **"Place of Business, Location of Collateral"** – See Schedule A, No. 9.

1.35    **"Purchase Price"** – shall have that meaning as described in Section 2.2 herein.

1.36    **"Records"** – shall have that meaning set forth in Section 5.4 herein.

1.37    **"Renewal Term"** – shall mean each consecutive 12 month term as provided for in Section 2.10, and automatically renewing for each consecutive period thereafter.

1.38    **"Reserve"** – a bookkeeping account on the books of Sallyport representing an unpaid portion of the Purchase Price, maintained by Sallyport to ensure Borrower's performance with the provisions hereof.

1.39    **"Trade Names and Styles"** – Shall mean the trade names and styles set forth in Schedule A. No. 10.

2.    **Bulk Purchase.**

2.1    **Sale of Accounts.** Borrower shall present to Sallyport Eligible Accounts for purchase pursuant to this Agreement in the Availability Certificate. Borrower agrees that it will do all of its business through Sallyport as Borrower's sole factor and Borrower hereby assigns and sells to Sallyport, as absolute owner, all Accounts. Sallyport shall be under no obligation to purchase Borrower's Accounts and shall only purchase Accounts in its sole discretion. Unless Sallyport notifies Borrower to the contrary as to a specific Account, all Accounts shall be deemed purchased by Sallyport upon presentment by Borrower. Although an Account may appear on an Availability Certificate multiple times, the Account is being purchased the first time such Account appears on an Availability Certificate. Seller hereby sells, transfers and assigns and Sallyport hereby purchases all right, title and interest of Seller in and to all of the Accounts previously financed and/or granted as a collateral security pursuant to the Loan and Security Agreement and Sallyport is hereby deemed to be the absolute owner of all right, title and interest in an to all such Accounts.

2.1.1    **Application of Payments.** As Accounts are paid by Account Debtors, such sums shall be applied to satisfy the Account due from the Account Debtor that Sallyport purchased from Borrower hereunder. Sallyport shall be entitled to all such collections. Borrower shall not have any interest in such payments made by Account Debtors once the Account is sold to Sallyport hereunder. Once Sallyport receives payment on an Account, Sallyport will apply the amount due Borrower against the amount Borrower owes Sallyport for Obligations.

2.2    **Purchase Price of Accounts.** The Purchase Price for Accounts which are Accounts at the time of their sale to Sallyport is the gross amount of the Account (the "Gross Invoice Amount") less all credits, discounts and allowances at any time issued, owing or granted to, or claimed or taken by the Account Debtor. The Purchase Price is due at the time an Account has been paid by the Account Debtor. The Purchase Price for an Eligible Account, or any portion thereof, may be paid in advance of the due date in Sallyport's sole discretion. Any payment of the Purchase Price in advance of its due date shall not obligate Sallyport to advance the Purchase Price of any other Eligible Account at any time. Advances of the Purchase Price hereunder shall at no time exceed the Maximum Facility Limit Amount. The consideration provided by Sallyport to Borrower for the purchase of any Accounts which are not Eligible Accounts at the time of their sale to Sallyport is the contingent increase in, and the amount of any increase in, the Availability Pool if and when such Accounts are collected, less the respective Reserve; provided, however, if any such Accounts become Eligible Accounts after their sale to Sallyport, the consideration for the purchase of such Accounts shall also include the amount of increase in the Availability Pool resulting from such Accounts becoming Eligible Accounts. All Accounts purchased during any time in which the Account Payment Base exceeds the Maximum Facility Limit Amount shall be deemed to be ineligible Accounts for which the purchase price shall be as provided in the second sentence of this Subsection, and for this purpose such ineligible Accounts may become Eligible Accounts if and to the extent that the Account Payment Base no longer exceeds the Maximum Facility Limit Amount. Notwithstanding the above, the Purchase Price for the Accounts previously financed shall be calculated using the formulas provided herein to the amounts otherwise outstanding and the parties shall agree upon the value of such amounts and the applicable fees due and Reserves available for such Accounts in advance of the execution of this Agreement.

2.3    **Factoring Fees.** Sallyport shall charge Borrower a factoring fee ("Factoring Fee") equal to 0.55% of the gross face amount of each Account purchased at the time each Account is purchased hereunder. In addition to the Factoring Fee, an additional factoring fee ("Additional Factoring Fee(s)") shall be charged each day for each Account purchased is outstanding to the extent the Purchase Price was paid in advance of its due date. All factoring fees under this Agreement shall be computed and earned daily on the gross amount of the Daily Balance. The Initial Setup Fee shall be fully earned and payable upon execution of this Agreement and on the anniversary date of each year following to the extent this Agreement is in effect on the start of such date.

2.4    **Calculation of Factoring Fees.** Borrower will pay Sallyport the Additional Factoring Fees (hereafter referred to as "Interest") on the Daily Balance. Interest will be calculated and earned daily at a rate per annum equal to the amount provided for in Schedule A, No. 11, plus the Base Rate (collectively, the "Interest Rate") and will be reserved during the course of the month but will be charged to Borrower's account on the last day of the month. However, the Base Rate will not be lower than the Base Rate Floor amount provided for in Schedule A, No. 12, at any time. The Interest Rate will also be charged to Borrower on all other Obligations, except those specifying a different rate, from the date incurred through the date paid. Any publicly announced decrease or increase in the Base Rate will result in an adjustment to the Interest Rate on the next business day. After the occurrence of an Event of Default and for so long as such Event

EXHIBIT __A__

Page __3__ of __18__

3

of Default continues, all the Obligations will, at Sallyport's option, with or without the notice to Borrower, bear interest at the Default Rate. Interest will be calculated on the basis of a 360-day year for the actual number of days elapsed. In no event will the total amount of interest received by Sallyport exceed the amount of interest permitted by applicable law and in the event excess interest is determined by a court of competent jurisdiction to have been paid by Borrower to Sallyport, such excess interest will be applied as a credit against the outstanding Obligations and Borrower will not have any action against Sallyport or any damages arising out of the payment or collection of such excess interest. If an Account or any payment is charged back to Borrower after the collection date, Borrower will pay Sallyport interest at the Interest Rate on such Account or on such payment.

2.5    **Reserve.** Sallyport shall charge and retain an amount equal to the inverse of the Advance Rate, of the gross face amount of each Account purchased from Borrower, which amount shall be held as the Reserve. Sallyport may, from time to time, at its sole discretion, charge the aggregate Reserve with: (a) any losses which may be incurred in relation to any Account purchased hereunder; (b) any Account that Sallyport determines are not Eligible Accounts; (c) anticipated fees identified and payable under this Agreement; (d) any other obligation due to Sallyport under this Agreement; or (e) other amounts that Sallyport deems appropriate in its sole discretion. Sallyport agrees to maintain the Reserve mentioned herein, the maintenance of which, however, shall not vest the Borrower any right, title, or interest herein, it being understood that the account shall be kept as a reserve to pay the Obligations of the Borrower incurred under the provisions of this Agreement. Provided that there is no Event of Default, Sallyport, in its sole discretion, may initiate rebates to Borrower from the Reserve. Sallyport, in its sole discretion, may adjust the percentage of the Reserve.

2.6    **Repurchase Rights.** Sallyport may require that Borrower immediately repurchase, by payment of the then unpaid face amount of any purchased Account, together with any unpaid fees and other amounts owed relating to the purchased Account on demand, or at Sallyport's option, by Sallyport's charge to the Reserve, upon the following events: (a) an Account is not paid by the Account Debtor within sixty (60) days of the due date set forth on the invoice for the purchased Account; (b) Borrower has breached any warranties or promises in this Agreement with regard to an unpaid Account; (c) Borrower and Account Debtor are involved in a Dispute of any kind, regardless of validity; (d) the Account Debtor asserts a claim of loss of any kind against Borrower and/or Sallyport; and/or (e) an insolvency or other financial inability of the Account Debtor to pay. Any Accounts not paid within ninety (90) days of purchase and not repurchased by Borrower, shall incur the Default Factoring Fee, as provided for in Schedule A.

2.7    **Assignments and Other Documentation.** All bills and invoices for all Accounts assigned to or purchased by Sallyport hereunder shall bear the following legend: "This account has been assigned to and payable only to Sallyport Commercial Finance, LLC. Any concerns about this invoice must be reported to Sallyport Commercial Finance, LLC, at said address". In the event that Borrower sends to an Account Debtor any invoice evidencing a purchased Account which does not contain such notation (or such other notation otherwise acceptable to Sallyport as provided for in this Section), it will be impracticable or extremely difficult to determine the resulting damages suffered by Sallyport. It is therefore agreed that Borrower shall immediately pay to Sallyport as liquidated damages the Missing Notation Fee. Borrower shall immediately provide to Sallyport such additional information as requested by Sallyport relating to any Account. All bills and invoices for all Accounts shall be in a form acceptable to Sallyport containing such terms and conditions as Sallyport requires.

2.8    **Online Statement of Account.** Sallyport shall post all of Borrower's account activity on Sallyport's website, which shall constitute Borrower's Online Statement of Account. Sallyport shall not send Borrower any hard copies of any activities which constitute Borrower's Online Statement of Account. Provided that there is no Event of Default, Sallyport shall provide Borrower with continuous access to view the Online Statement of Account. Borrower shall be solely responsible for checking its Online Statement of Account. If Borrower disputes any entry on the Online Statement of Account it shall, within thirty (30) days after the first posting of the event, send to Sallyport a written exception to such entry. Unless Sallyport receives a timely written exception to the activity posted to the Online Statement of Account, within thirty (30) days after it is first posted, the Online Statement of Account shall become an account stated and be deemed accepted by Borrower and shall be conclusive and binding upon the Borrower.

2.9    **Credits and Returns.** Borrower will issue credits only with Sallyport's prior written approval, and only if claimed by the Account Debtor. In addition to the Accounts, Borrower hereby sells, assigns and transfers to Sallyport all of its right, title and interest in and to the goods the sale of which resulted in the creation of Accounts, and in all such goods that may be returned by Account Debtors, and all causes of action and rights in connection therewith which Borrower now has or may hereafter acquire, including its rights of reclamation, replevin and stoppage in transit and the rights as an unpaid vendor or lienor. Any goods so recovered shall be treated as returned goods, and shall be set aside, marked with Sallyport's name and held for Sallyport's account as owner. Borrower shall notify Sallyport promptly of all such returns.

2.10    **Term of this Agreement, Minimum Monthly Sales Shortfall Fee.** This Agreement shall be in effect for the Original Term and shall automatically renew for consecutive Renewal Terms unless terminated by Borrower or Sallyport as follows. Borrower may terminate this Agreement upon providing Sallyport with written notice not more than ninety (90) days and not less than Sixty (60) days prior to the end of the Original Term or any Renewal Term, which written notice shall clearly state its intention to terminate at the end of the current term. Sallyport may terminate this Agreement upon providing Borrower written notice of not less than Thirty (30) days prior to the end of the Original Term or any Renewal Term, which notice shall clearly state its intention to terminate at the end of the Current Term. In addition, Sallyport may terminate this Agreement at any time after an Event of Default. As consideration for Sallyport making the necessary financial accommodations and foregoing other factoring opportunities available in the market place, Borrower agrees to pay Sallyport during the Original Term and for each Renewal Term, the Minimum Monthly Sales Shortfall Fee if, at the end of each monthly period, the actual monthly sales volume is less than the Minimum Monthly Sales Volume. Sallyport may charge Borrower with the amount of such deficiency in the form of an assessment of the Minimum Monthly Sales Shortfall Fee. If Borrower terminates this Agreement at any time prior to the expiration of the Original Term, or any subsequent Renewal Term, or if Sallyport terminates this Agreement at any time upon the occurrence of an Event of Default, Borrower shall remain obligated to pay the total of the Minimum Monthly Sales Shortfall Fee for the time remaining for the Original Term or Renewal Term, as the case may be.

2.11    **Other Operational Fees and Costs.** Borrower shall pay Sallyport all other fees and costs incurred hereunder immediately when due, including but not limited to all fees and costs set forth in Schedule A.



EXHIBIT A
Page 4 of 18

4

3.     **Collateral, Grant of Security Interest, ACH Authorization.**

    3.1     **Collateral.** As security and collateral for the Obligations, Borrower hereby grants Sallyport a continuing security interest in, and assigns to Sallyport, all of Borrower's right, title and interest in and to the Collateral.

    3.2     **Filing Authorization.** Borrower hereby authorizes Sallyport to file any document it deems necessary to perfect its security interest in the Collateral, including but not limited to UCC-1 financing statements and any applicable amendments or continuation statements.

    3.3     **ACH Authorization.** In order to satisfy any of the Obligations and facilitate the purchase of Accounts, Sallyport is hereby authorized by Borrower to initiate electronic debit or credit entries through the ACH. This authorization is irrevocable.

4.     **Representations, Warranties and Covenants of Borrower.** To induce Sallyport to enter into this Agreement, Borrower represents and warrants that each of the following representations and warranties now is and hereafter will continue to be true and correct in all respects and Borrower has and will timely perform each of the following covenants:

    4.1     **Existence and Power.** If Borrower is a partnership, limited liability company or corporation, Borrower is and will continue to be duly authorized, validly existing and in good standing under the laws of the jurisdiction of its organization. Borrower is and will continue to be qualified and licensed in all jurisdictions in which the nature of the business transacted by it, or the ownership or leasing of its property, make such qualification of licensing necessary, and Borrower has and will continue to have all requisite power and authority to carry on its business as it is now, or may hereafter be, conducted.

    4.2     **Authority.** Borrower is, and will continue to be, duly empowered and authorized to enter into, and grant security interests in its property, pursuant to and perform its obligations under this Agreement, and all other instruments and transactions contemplated hereby or relating hereto. The execution, delivery and performance by Borrower of this Agreement, and all other instruments and transactions contemplated hereby or relating hereto, have been duly and validly authorized, are enforceable against the Borrower in accordance with their terms, and do not and will not violate any law or any provision of, nor be grounds for acceleration under, any agreement, indenture, note or instrument which is binding upon Borrower, or any of its property, including without limitation, Borrower's Operating Agreement, Partnership Agreement, Articles of Incorporation, By-Laws and any Shareholder Agreements (as applicable).

    4.3     **Name, Trade Names and Styles.** Borrower has set forth above its absolutely true and correct name. Set forth in Schedule A, No. 10, is each prior true name of Borrower and each fictitious name, trade name and trade style by which Borrower has been, or is now known, or has previously transacted, or now transacts business.

        4.3.1     Borrower shall provide Sallyport with thirty (30) days' advance written notice before doing business under any other name, fictitious name, trade name or trade style. Borrower has complied, and will hereafter comply, with all laws relating to the conduct of business under, the ownership of property in, and the renewal or continuation of the right to use, a corporate, fictitious or trade name or trade style.

    4.4     **Place of Business; Location of Collateral.** Borrower's books and records, including, but not limited to, the books and records relating to Borrower's Accounts are and will be kept and maintained at Borrower's Address unless and until Sallyport shall otherwise consent in writing. In addition to Borrower's Address, Borrower has places of Business and Collateral located only at the following locations: See Schedule A, No. 14.

        4.4.1     Borrower will provide Sallyport with at least thirty (30) days advance written notice in the event Borrower moves the Collateral, or obtains, opens or maintains any new or additional place(s) for the conduct of Borrower's business or the location of any Collateral, or closes any existing place of business.

    4.5     **Title to Collateral; Liens.** With the exception of Accounts purchased hereunder where title vests with Sallyport, Borrower is now, and will at all times hereafter be, the true, lawful and sole owner of all the Collateral. Except for the security interest granted to Sallyport, the Collateral now is and will hereafter remain, free and clear of any and all liens, charges, security interests, encumbrances and adverse claims. Except as expressly provided to the contrary in this Section, Sallyport now has, and will hereafter continue to have, a fully perfected and enforceable first priority security interest in all of the Collateral, and Borrower will at all times defend Sallyport and the Collateral against all claims and demands of others.

    4.6     **Accounts.** Each and every Account assigned to Sallyport shall, on the date the assignment is made and thereafter, comply with all of the following representations, warranties and covenants: (a) each Account represents an undisputed bona fide existing unconditional obligation of the Account Debtor created by the sale, delivery, and acceptance of goods or the rendition of services in the ordinary course of Borrower's business (except that Borrower creates and issues freight transportation invoices to Account Debtors upon placement of goods for delivery on motor vehicles or trailers and will complete delivery within five (5) days thereafter); (b) each Account is owned by Borrower free and clear of any and all deductions, Disputes, liens, security interests and encumbrances; (c) the Account Debtor has received and accepted the goods sold and services rendered which created the Account and the invoice therefore and will pay the same without any Dispute; (d) no Account Debtor on any Account is a shareholder, director, partner or agent of Borrower, or is a person or entity controlling, controlled by or under common control with Borrower; and (e) no Account is owed by an Account Debtor to whom Borrower is or may become liable in connection with goods sold or services rendered by the Account Debtor to Borrower or any other transaction or dealing between the Account Debtor and Borrower. Immediately upon discovery by Borrower that any of the foregoing representations, warranties, or covenants are or have become untrue with respect to any Account, Borrower shall immediately give written notice thereof to Sallyport. In the event that Borrower breaches the warranty contained in Section 4.6(a), it will be impracticable or extremely difficult to determine the resulting damages suffered by Sallyport. It is, therefore, agreed that Borrower shall immediately pay to Sallyport as liquidated damages the Invalid Invoice Fee for each Purchased Account which violates the warranty contained in Section 4.6(a). Borrower will promptly

EXHIBIT A
Page 5 of 18

5

notify Sallyport of any Dispute and settle all Disputes, at Borrower's own cost and expense (including attorneys' fees), and Borrower will immediately pay Sallyport the amount of all Accounts affected by any Dispute. Any Dispute not settled by Borrower within thirty (30) days after the maturity of the invoice affected thereby may, if Sallyport so elects, be settled, compromised, adjusted or litigated by Sallyport directly with the Account Debtor or other complainant for Borrower's account and risk and upon such terms and conditions as Sallyport, in Sallyport's sole discretion, deems advisable. Sallyport is under no duty to investigate the validity or merits of any Dispute. Sallyport may also, in Sallyport's discretion, take possession of and sell or cause the sale of any returned or recovered merchandise, at such prices, upon such terms and to such purchasers as Sallyport deems proper, and, in any event, to charge the deficiency, costs and expenses thereof, including attorneys' fees, to Borrower. In addition to all other rights Sallyport has hereunder, whenever there is any Dispute, or if any Account as to which Sallyport has not assumed the risk of nonpayment is unpaid at its maturity, Sallyport may chargeback the amount of the Account so affected or unpaid (as well as all other Accounts due and owing from that Account Debtor) to Borrower; but such chargeback shall not be deemed nor shall it constitute a reassignment to Borrower of the Account affected thereby, and title thereto and to the Goods giving rise thereto shall remain with Sallyport until Sallyport is fully reimbursed, regardless of the date or dates on which Sallyport charges back the amount of any Account with respect to which there is any Dispute, or the amount owing from an Account Debtor which has raised any Dispute.

4.7     **Documents Genuine, Legal Compliance, Disposition.** All statements made and all unpaid balances appearing in all invoices, instruments and other documents evidencing the Accounts are and shall be true and correct and all such invoices, instruments and other documents and all of Borrower's books and records are and shall be genuine and in all respects what they purport to be and all signatories and endorsers have full capacity to contract. All sales and other transactions underlying or giving rise to each Account shall fully comply with all applicable laws and governmental rules and regulations. All signatures and endorsements on all documents, instruments, and agreements relating to all Accounts are and shall be genuine and all such documents, instruments and agreements are and shall be legally enforceable in accordance with their terms. Borrower has not, and shall not hereafter sell, assign, pledge, encumber, forgive (completely or partially), settle for less than payment in full, or transfer or dispose of any Account, or agree to do any of the foregoing.

4.8     **Maintenance of Collateral.** Borrower has maintained and will hereafter maintain the Collateral and all of Borrower's assets useful or necessary in the conduct of Borrower's business in good working order and condition, at Borrower's sole cost and expense. Borrower will not use the Collateral or any of Borrower's other properties, or any part thereof, in any unlawful business or for any unlawful purpose and will not secrete or abandon the Collateral, such properties, or any part thereof. Borrower will not store any of the Collateral with any warehouseman or any other third party without Sallyport's prior written consent. Borrower will immediately advise Sallyport in writing of any event causing loss or depreciation and of any material adverse change in the condition of the Collateral or of any of Borrower's other properties.

4.9     **Books and Records.** Borrower has maintained and will continue to maintain at Borrower's Address complete and accurate books and records comprising a standard and modern accounting system in accordance with generally accepted accounting principles that accurately and correctly record and reflect Borrower's income, expenses, liabilities, operations, accounts, and ownership and location of the Collateral and any other asset now or hereafter belonging to Borrower. All reserves (including, without limitation, reserves for bad debts, depreciation and taxes) provided for upon Borrower's books and records are now, and will hereafter be, maintained in sufficient amounts in accordance with generally accepted accounting principles consistently applied. All such books and records and all documents relating to any of the Collateral are and will continue to be genuine and in all respects what they purport to be and will contain such information as may be requested by Sallyport.

4.10     **Financial Condition and Statements.** All financial statements (including, but not limited to, balance sheets, profit and loss figures, and accountants' comments) now or hereafter delivered to Sallyport have been, and will be, prepared in conformity with generally accepted accounting principles and now and hereafter will completely and accurately reflect the financial condition, contingent liabilities and results of Borrower and Borrower's operations at the times and for the periods therein stated. Borrower is now, and, at all times hereafter, will continue to be solvent. The covenant set forth in the preceding sentence shall be deemed breached if at any time Sallyport estimates that the value of all Borrower's assets, if sold in bulk for liquidation purposes, would not be sufficient to pay the total of Borrower's liabilities (whether or not such liabilities are then due) or if Sallyport has determined that Borrower has failed to pay promptly when due all loans and all debts to trade and other creditors (unless Sallyport is satisfied that the reason for such nonpayment is a bona fide Dispute between Borrower and any of its creditors concerning the amount due). Borrower shall provide Sallyport with copies of all financial statements and any other documents reflecting Borrower's financial situation within five (5) days after Sallyport's request.

4.11     **Tax Returns.** Borrower has timely filed, and will hereafter timely file, all tax returns and reports required by foreign, federal, state or local law. Borrower has timely paid, and will hereafter timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions now or hereafter owed by Borrower (including, but not limited to, income, franchise, personal property, real property, FICA, excise, withholding, sales and use taxes). Borrower may defer payment of any contested taxes provided that Borrower: (i) in good faith contests Borrower's obligation to pay such taxes by appropriate proceedings promptly and diligently instituted and conducted; (ii) notifies Sallyport in writing of the commencement and of any material development in such proceedings; and (iii) posts bonds or takes any other steps required to keep such contested taxes from becoming a lien against or charge upon any of the Collateral or other properties of Borrower. Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower. When requested, Borrower will furnish Sallyport with proof satisfactory to Sallyport of Borrower's making the payment or deposit of all such taxes, such proof to be delivered within five (5) days after the due date established by law for each such payment or deposit. In the event Borrower fails or is unable to pay or deposit such taxes, Sallyport may, but is not obligated to, pay the same and treat all such advances as an additional advance to Borrower. Such advances shall incur fees as outlined in this Agreement.

4.12     **Compliance with Law, and Environmental Laws.** Borrower has complied, and will hereafter comply, with all provisions of all foreign, federal, state and local law relating to Borrower, including, but not limited to, those relating to Borrower's ownership of real or personal property, conduct and licensing of Borrower's business and employment of Borrower's personnel. Borrower has been and is currently in compliance with all applicable Environmental Laws, including obtaining and maintaining in effect all permits, licenses or other authorizations required by applicable Environmental Laws. There are no claims, liabilities, investigations, litigation, administrative

proceedings, whether pending or threatened, or judgments or orders relating to any hazardous materials asserted or threatened against Borrower or relating to any real property currently or formerly owned, leased or operated by Borrower.

4.13     **Litigation.** There is no claim, suit, litigation, proceeding or investigation pending or threatened by or against or affecting Borrower in any court or before any regulatory commission, board or other governmental agency (or any basis therefore known to Borrower) which might result, either separately or in the aggregate, in any adverse change in the business, prospects or condition of Borrower, or in any impairment in the ability or right of Borrower to carry on its business in substantially the same manner as it is now being conducted. Borrower will immediately inform Sallyport in writing of any claim, proceeding, litigation or investigation hereafter threatened or instituted by or against Borrower.

4.14     **Complete Disclosure.** There is no fact which Borrower has not disclosed to Sallyport in writing which could materially adversely affect the properties, business or financial condition of Borrower or any of the Collateral or which is necessary to disclose in order to keep the foregoing representations and warranties from being misleading.

4.15     **Continuing Effect.** All representations, warranties and covenants of Borrower contained in this Agreement and any other agreement with Sallyport shall be true and correct at the time of the effective date of each such agreement and shall be deemed continuing and shall remain true, correct and in full force and effect until payment and satisfaction in full of all of the Obligations, and Borrower acknowledges that Sallyport is and will be expressly relying on all such representations, warranties and covenants in making advances to Borrower.

4.16     **No Violation of Federal or State Law.** No Account or any contract related thereto in any manner contravenes any federal, state or local law, rule or regulation applicable thereto.

4.17     **Notification of Violations.** Borrower shall within five (5) business days notify Sallyport in writing of any violation of any law, statute, regulation or ordinance of any governmental entity, or any agency thereof, applicable to Borrower which may materially affect the Collateral or Borrower's operations.

5.     **Additional Continuing Duties of Borrower.**

5.1     **Duties Regarding Accounts.**

(a)     Borrower shall deliver to Sallyport schedules and assignments of all Accounts on Sallyport's standard form; provided, however, that Borrower's failure to execute and deliver the same shall not affect or limit Sallyport's security interest and other rights in and to all of Borrower's Accounts, nor shall Sallyport's failure to purchase a specific Account affect or limit Sallyport's security interest and other rights therein. Together with each such schedule and assignment, or later if requested by Sallyport, Borrower shall furnish Sallyport with copies (or, at Sallyport's request, originals) of all contracts, orders, invoices, and other similar documents, and all original shipping instructions, delivery receipts, bills of lading, other evidence of delivery, time records, and any other documents requested by Sallyport for any goods or services which gave rise to such Accounts, and Borrower warrants the genuineness of all of the foregoing. Borrower shall also furnish to Sallyport an aged accounts receivable trial balance in such form and as often as Sallyport requests, and Borrower agrees that Sallyport may from time to time verify directly with the respective Account Debtors the validity, amount and any other matters relating to the Accounts by means of mail, email, telephone or otherwise, either in the name of Borrower or Sallyport or such other name as Sallyport may choose. In addition, Borrower shall, at Sallyport's request, immediately deliver to Sallyport the originals of all instruments, chattel paper, security agreements, guaranties and other documents and property evidencing or securing any Accounts, along with all necessary endorsements (all of which shall be with recourse).

(b)     Sallyport shall have the sole and exclusive right to collect the Accounts. All monies, checks, notes, drafts, money orders, acceptances and other things of value and items of payment, together with any and all related vouchers, identifications, communications and other data, documents and instruments, which for any reason may be received by Borrower (or by any receiver, trustee, custodian or successor in interest of Borrower, or any person acting on behalf of Borrower) in payment of, or in reference to, the Accounts shall belong to Sallyport, and, not later than one (1) day after receipt thereof by Borrower, Borrower shall deliver the same to Sallyport, at Sallyport's office in the original form in which the same are received, together with any necessary endorsements, including, without limitation, the endorsement of Borrower, all of which endorsements shall be with full recourse. Borrower shall have no right, and agrees not to commingle any of the proceeds of any of the collections of the Accounts with Borrower's own funds and Borrower agrees not to use, divert or withhold any such proceeds. Borrower hereby divests itself of all dominion over the Accounts and the proceeds thereof and collections received thereon. The parties hereto agree that if any payment on account of a purchased Account which has been received by Borrower is not delivered in kind to Sallyport on the next business day following the date of receipt by Borrower; it will be impracticable or extremely difficult to determine the resulting damages suffered by Sallyport. It is therefore agreed that in the event of such a breach by Borrower, Borrower shall immediately pay Sallyport the Misdirected Payment Fee as liquidated damages for Borrower's breach of the foregoing warranty. Borrower shall make entries on its books and records in form satisfactory to Sallyport disclosing the absolute and unconditional assignment of all Accounts to Sallyport. Sallyport may charge to the Obligations all costs and expenses incurred by Sallyport in collecting Accounts, including, without limitation, travel expenses, postage, telephone and telegraph charges, salaries of Sallyport personnel, and attorneys' fees.

(c)     Any goods which are returned by an Account Debtor or otherwise recovered by or for the benefit of Borrower shall be physically segregated, posted with written notice that they are subject to Sallyport's security interest, and held in trust for Sallyport for such disposition as Sallyport shall direct. Borrower shall promptly notify Sallyport of all such returns and recoveries. No return of merchandise shall be accepted by Borrower and no sale of returned goods shall be made by Borrower without Sallyport's prior written consent. Sallyport shall have the right acting alone to accept the return of any goods directly from an Account Debtor, without notice to or consent by Borrower, and neither the delivery by Borrower of returned or recovered goods to Sallyport, nor the acceptance by Sallyport of returns directly from an Account Debtor shall in any way affect Borrower's liability to Sallyport on account of the Obligations.



EXHIBIT A

Page 7 of 18

(d)　　Borrower shall promptly notify Sallyport of all Disputes and claims with respect to the Accounts. Borrower shall not, without Sallyport's prior written consent, compromise or adjust any Account, or grant any discount, credit, allowance, or extension of time for payment to any Account Debtor. Sallyport shall have the right, in its sole and absolute discretion, to settle, accept reduced amounts and adjust Disputes and claims directly with, and give releases on behalf of Borrower to Account Debtors for cash, credit or otherwise, upon terms which Sallyport, in its sole and absolute discretion, considers advisable, and in such case, Sallyport will credit Borrower's account with only the net amounts of cash received by Sallyport in payment of the Accounts, less all costs and expenses (including, without limitation, attorneys' fees) incurred by Sallyport in connection with the settlement or adjustment of such Disputes and the collection of such Accounts.

5.2　　**Insurance.** Borrower shall, at all times, and for such periods of time as Sallyport may require, at Borrower's expense, insure all of the insurable Collateral, and all of Borrower's books and records, by financially sound and reputable insurers acceptable to Sallyport, in the form of extended coverage policies against loss or damage by theft, embezzlement, fire, explosion, flood, sprinkler, or any other insurable event or risk that Sallyport may require, to the fullest extent of the insurable value thereof. All such insurance policies shall name Sallyport as the exclusive loss payee, shall provide that proceeds payable thereunder shall be payable directly to Sallyport unless notarized written authority to the contrary is obtained from Sallyport, and shall also provide that no act or default of Borrower or any other person shall affect the right of Sallyport to recover thereunder. Upon receipt of the proceeds of any such insurance, Sallyport shall apply such proceeds in reduction of the Obligations, whether or not then due, in such order and manner as Sallyport shall determine, in its sole discretion. Borrower shall provide Sallyport with the original or a certificate of each such policy of insurance which shall contain a provision requiring the insurer to give not less than twenty (20) days advance written notice to Sallyport in the event of cancellation or termination of the policy for any reason whatsoever. If Borrower fails to provide or pay for any such insurance, Sallyport is authorized (but not obligated) to procure the same at Borrower's expense. Borrower agrees to deliver to Sallyport, promptly as rendered, true and correct copies of all reports made to all insurance companies.

5.3　　**Reports, Certificates.** At its sole cost and expense, Borrower shall report, in form satisfactory to Sallyport, such information as Sallyport may request regarding the Collateral; such reports shall be for such periods, shall reflect Borrower's records at such time and shall be rendered with such frequency as Sallyport may designate. At its sole cost and expense, Borrower shall promptly provide Sallyport with all such other information concerning its affairs as Sallyport may request from time to time hereafter, and shall immediately notify Sallyport of any adverse change in Borrower's financial condition and or any condition or event which constitutes a breach or an Event of Default under this Agreement. All reports furnished to Sallyport shall be complete, accurate and correct in all respects at the time furnished.

5.4　　**Access to Collateral, Books and Records.** At any and all times, Sallyport, and any person designated by Sallyport, shall have free access to, and the right without hindrance or delay, to inspect, audit, examine and test the Collateral and any other property of Borrower, wherever located, and to inspect, audit, check, copy and make extracts from Borrower's and Borrower's accountant's books, records and accounts (hereinafter collectively the "Records") and all computer data containing the same, no matter where the Records are stored. Borrower hereby irrevocably authorizes and directs any person including, but not limited to, any of Borrower's directors, members, officers, employees, agents, accountants and attorneys having possession or control of any of the Records to physically deliver them to Sallyport or any person designated by Sallyport upon Sallyport's request or, at the option of Sallyport, make them available to Sallyport wherever the Records may be located. Borrower waives the benefit of any evidentiary privilege precluding or limiting the disclosure, divulgence or delivery of any of the Records. Borrower shall pay Sallyport the Audit Fee immediately upon its accrual.

5.5　　**Prohibited Transactions.** Borrower shall not hereafter, without Sallyport's prior written consent: merge, consolidate, dissolve, acquire any other corporation; enter into any transaction not in the usual course of business; make any investment in any securities other than securities of the United States of America; guarantee or otherwise become in any way liable with respect to the obligations of another party or entity; pay or declare any dividends upon Borrower's stock; redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Borrower's stock; make any change in Borrower's name, identity, corporate or capital structure; alter any of Borrower's business objectives, purposes, or operations or financial structure in such a manner as to adversely affect the ability of Borrower to pay or perform any of the Obligations; lend or distribute any of Borrower's property or assets; incur any debts, outside of the ordinary course of Borrower's business, except extensions of existing debts and interest thereon; sell, lease, transfer, assign or otherwise dispose of any of the Collateral; or make any capital expenditures or leasehold improvements at a cost in the aggregate in any twelve-month period of more than $75,000.

5.6　　**Notification of Changes.** Borrower will promptly notify Sallyport in writing of any change of its officers, members, directors, partners, or key employees, a death of any partner or joint venturer (if Borrower is a partnership or joint venture), any purchase out of the regular course of Borrower's business and any adverse or material change in the business or financial affairs of Borrower.

5.7　　**Litigation Cooperation.** Should any suit or proceeding be instituted by or against Sallyport with respect to any Collateral or for the collection or enforcement of any Account, or in any manner relating to Borrower, Borrower shall, without expense to Sallyport, and wherever and whenever designated by Sallyport, make available Borrower and its officers, employees and agents and Borrower's books, records and accounts to the extent that Sallyport may deem necessary in order to prosecute or defend any such suit or proceeding.

5.8　　**Execute Additional Documentation.** Borrower agrees, at its sole cost and expense, on demand by Sallyport, to do all things and to execute all such security agreements, control agreements, deeds of trust, mortgages, assignments, certificates of title, applications for vehicle titles, affidavits, reports, notices, schedules of Accounts and all other documents, in form satisfactory to Sallyport, as Sallyport, in its sole and absolute discretion, may deem necessary or useful in order to perfect and maintain Sallyport's perfected first-priority security interest in the Collateral, and in order to fully consummate all of the transactions contemplated under this Agreement.

6.　　**Application of Payments.** Checks, instruments and all other non-cash payments delivered to Sallyport in payment or on account of the Accounts or the Obligations constitute conditional payment only until such items are actually paid in cash to Sallyport, for the purpose of computing fees earned by Sallyport, credit therefore and for bank wire transfers, shall be given after receipt by Sallyport, as



EXHIBIT A
Page 8 of 18

8

provided for in Schedule A, No. 14. All payments made by or on behalf of, and all credits due to Borrower, may be applied and reapplied in whole or in part to any of the Obligations to such extent and in such manner as Sallyport shall determine in its sole discretion. Sallyport shall have the continuing exclusive right to apply and reapply any and all such payments in such manner as Sallyport shall determine in its sole discretion, notwithstanding any entry by Sallyport upon any of its books and records. Any payments received on any Account not eligible to be factored by Sallyport shall be placed in the Reserve. Any payments received on any Account eligible to be factored by Sallyport, but not received by Sallyport, will be assessed an Initial Factoring Fee.

### 7. Events of Default and Remedies.

7.1      **Events of Default.** The occurrence of any one of more of the following shall constitute an Event of Default hereunder: (a) Borrower fails to pay or perform any Obligation as and when due; (b) there shall be commenced by or against Borrower any voluntary or involuntary case under the United States Bankruptcy Code, or any assignment for the benefit of creditors, or appointment of a receiver or custodian for any of its assets, or Borrower makes or sends notice of a bulk transfer; (c) Borrower or any guarantor of the Obligations shall become insolvent in that its debts are greater than the fair value of its assets, or Borrower is generally not paying its debts as they become due or is left with unreasonably small capital; (d) any lien, garnishment, attachment, execution or the like is issued against or attaches to the Borrower, Accounts purchased under this Agreement, or the Collateral; (e) Borrower shall breach any covenant, agreement, warranty, or representation set forth herein; (f) Borrower delivers any document, financial statement, schedule or report to Sallyport which is false or incorrect in any material respect; (g) Sallyport, at any time, acting in good faith and in a commercially reasonable manner, deems itself insecure; or (h) any present or future guarantor of the Obligations revokes, terminates, or fails to perform any of the terms of any guaranty, endorsement or other agreement of such party in favor of Sallyport or any affiliate of Sallyport.

7.2      **Remedies.** Upon the occurrence of any Event of Default, and at any time thereafter, Sallyport, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Borrower) may do any one or more of the following: (a) cease advancing money or extending credit to or for the benefit of Borrower under this Agreement, and any other document or agreement; (b) accelerate and declare all or any part of the Obligations to be immediately due, payable, and performable, notwithstanding any deferred or installment payments allowed by any instrument evidencing or relating to any Obligation; (c) take possession of any or all of the Collateral wherever it may be found, and for that purpose Borrower hereby authorizes Sallyport without judicial process to enter onto any of the Borrower's premises without hindrance to search for, take possession of, keep, store, or remove any of the Collateral and remain on such premises or cause a custodian to remain thereon in exclusive control thereof without charge for so long as Sallyport deems necessary in order to complete the enforcement of its rights under this Agreement or any other agreement; provided, however, that should Sallyport seek to take possession of any or all of the Collateral by Court process or through a receiver, Borrower hereby irrevocable waives: (i) any bond and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession; (ii) any demand for possession prior to the commencement of any suit or action to recover possession thereof; and (iii) any requirement that Sallyport retain possession of and not dispose of any such Collateral until after trial or final judgment; (d) require Borrower to assemble any or all of the Collateral and make it available to Sallyport at a place or places to be designated by Sallyport which is reasonably convenient to Sallyport and Borrower, and to remove the Collateral to such locations as Sallyport may deem advisable; (e) place a receiver in exclusive control of Borrower's business and/or any or all of the Collateral, in order to assist Sallyport in enforcing its rights and remedies; (f) sell, ship, reclaim, lease or otherwise dispose of all or any portion of the Collateral in its condition at the time Sallyport obtains possession or after further manufacturing, processing or repair; at any one or more public and/or private sale(s) (including execution sales); in lots or in bulk; for cash, exchange for other property or on credit; and to adjourn any such sale from time to time without notice other than oral announcement at the time scheduled for sale. Sallyport shall have the right to conduct such disposition on Borrower's premises without charge for such time or times as Sallyport deems fit, or on Sallyport's premises, or elsewhere and the Collateral need not be located at the place of disposition. Sallyport may directly or through any affiliated company purchase or lease any Collateral at any such public disposition and, if permissible under applicable law, at any private disposition. Any sale or other disposition of Collateral shall not relieve Borrower of any liability Borrower may have if any Collateral is defective as to title or physical condition at the time of sale; (g) demand payment of, and collect any Accounts, Instruments, Chattel Paper, Supporting Obligations and General Intangibles comprising part or all of the Collateral; or (h) demand and receive possession of any of Borrower's federal and state income tax returns and the books, records and accounts utilized in the preparation thereof or referring thereto. Any and all attorneys' fees, expenses, costs, liabilities and obligations incurred by Sallyport with respect to the foregoing shall be added to and become part of the Obligations, and shall be due on demand. In the event that Borrower commits any Event of Default, and Sallyport elects to terminate this Agreement or this Agreement is otherwise terminated early for any reason, it will be impracticable or extremely difficult to calculate the resulting damages upon such termination. Therefore, the parties agree that Borrower shall pay Sallyport an Early Termination Fee, calculated as five percent (5%) of the Maximum Facility Limit, as liquidated damages for any early termination of this Agreement (the "Early Termination Fee").

7.3      **Application of Proceeds from Disposition or Collection of Collateral.** The proceeds received by Sallyport from the disposition or collection of any of the Collateral shall be applied to such extent and in such manner as Sallyport shall determine in its sole discretion. If any deficiency shall arise, Borrower shall remain liable to Sallyport therefore. In the event that, as a result of the disposition of any of the Collateral, Sallyport directly or indirectly enters into a credit transaction with any third party, Sallyport shall have the option, exercisable at any time, in its sole discretion, of either reducing the Obligations by the principal amount of such credit transaction or deferring the reduction thereof until the actual receipt by Sallyport of cash therefore from such third party.

7.4      **Online Access.** Upon an Event of Default, all of Borrower's rights and access to any online internet services that Sallyport makes available to Borrower shall be provisional pending Borrower's curing of all such Events of Default and Sallyport may elect to terminate Borrower's online access as provided for herein. During such period of time, Sallyport may limit or terminate Borrower's access to online services. Borrower acknowledges that the information Sallyport makes available to Borrower through online internet access, both before and after an Event of Default, constitutes and satisfies any duty to respond to a request for accounting or request regarding a statement of account that is referenced in the UCC.

7.5      **Standards of Commercial Reasonableness.** After an Event of Default, the parties acknowledge that it shall be presumed commercially reasonable and Sallyport shall have no duty to undertake to collect any Account, including those in which Sallyport



EXHIBIT A
Page 9 of 18

receives information from an Account Debtor that a Dispute exists. Furthermore, in the event Sallyport undertakes to collect or enforce an obligation of an Account Debtor or any other person obligated on the Collateral and ascertains that the possibility of collection is outweighed by the likely costs and expenses that will be incurred, Sallyport may at any such time cease any further collection efforts and such action shall be considered commercially reasonable. Before Borrower may, under any circumstances, seek to hold Sallyport responsible for taking any uncommercially reasonable action, Borrower shall first notify Sallyport in writing, of all of the reasons why Borrower believes Sallyport has acted in any uncommercially reasonable manner and advise Sallyport of the action that Borrower believes Sallyport should take.

       7.6    **Formation of New Entity.** In the event Borrower or any one or more of its principals, officers or directors during the term of this Agreement or while Borrower remains liable to Sallyport for any Obligations under the Agreement or arising out of or related to the Agreement, (i) forms a new entity; or (ii) has failed to disclose to Sallyport at the time of the Effective Date of this Agreement an existing entity, that does business similar to that of Borrower, whether in the form of a corporation, partnership, limited liability company or otherwise, such entity shall be deemed to have expressly assumed the obligations due Sallyport by Borrower under the Agreement. Upon the formation of any such entity, Sallyport, in addition to all of its available remedies, shall be deemed to have been granted an irrevocable power of attorney with authority to file a new financing statement with the appropriate secretary of state or UCC filing office naming the newly formed successor business or undisclosed existing business, as a debtor or new debtor. Sallyport shall have the right to notify the successor entity's or undisclosed existing entity's Account Debtors of Sallyport's security interest, its right to collect all Accounts, and to notify any new secured party who has sought to obtain a competing security interest of Sallyport's right in such entity's assets. Borrower shall indemnify Sallyport, pursuant to Section 10.5 herein, from any claims against Sallyport which arises out of Sallyport exercising any of its rights hereunder.

       7.7    **Remedies Cumulative.** In addition to the rights and remedies set forth in this Agreement, Sallyport shall have all the other rights and remedies accorded a secured party under the UCC and under any and all other applicable laws and in any other instrument or agreement now or hereafter entered into between Sallyport and Borrower and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Sallyport of one or more of its rights or remedies shall not be deemed an election, nor bar Sallyport from subsequent exercise or partial exercise of any other rights or remedies. The failure or delay of Sallyport to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been fully paid and performed.

       8.    **Power of Attorney.** Borrower grants to Sallyport an irrevocable power of attorney coupled with an interest authorizing and permitting Sallyport (acting through any of its employees, attorneys or agents) at any time, at its option but without obligation, with or without notice to Borrower, and at Borrower's sole expense, to do any or all of the following, in Borrower's name or otherwise: (a) execute on behalf of Borrower any document that Sallyport may, in its sole discretion, deem advisable in order to perfect, maintain or improve Sallyport's security interests in the Collateral or other real or personal property intended to constitute Collateral, or in order to exercise a right of Borrower or Sallyport, or in order to fully consummate all the transactions contemplated under this Agreement, and all other present and future agreements; (b) at any time after the occurrence of an Event of Default, execute on behalf of Borrower any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or to lease (as lessor or lessee) any real or personal property; (c) execute on behalf of Borrower, any invoices relating to any Account, any draft against any Account Debtor and any notice to any Account Debtor, any proof of claim in bankruptcy, any notice of lien, claim of mechanic's, materialman's or other lien, or assignment of satisfaction of mechanic's, materialman's or other lien; (d) take control in any manner of any cash or non-cash items of payment or proceeds of Collateral; endorse the name of Borrower upon any instruments, notes, acceptances, checks, drafts, money orders, bills of lading, freight bills, chattel paper or other documents, evidence of payment or Collateral that may come into Sallyport's possession; (e) upon the occurrence of any Event of Default, to receive and open all mail addressed to Borrower; and, in the exercise of such right, Sallyport shall have the right, in the name of Borrower, to notify the Post Office authorities to change the address for the delivery of mail addressed to Borrower to such other address as Sallyport may designate, including, but not limited to, Sallyport's own address; Sallyport shall turn over to Borrower all of such mail not relating to the Collateral; such right to redirect mail granted to Sallyport is irrevocable and Borrower shall not have the right to notify the Post Office to change the address for delivery after Sallyport has exercised such right; (f) upon the occurrence of any Event of Default, to direct any financial institution which is a participant with Sallyport in extensions of financing to or for the benefit of Borrower, or which is the institution with which any deposit account is maintained, to pay to Sallyport all monies on deposit by Borrower with said financial institution which are payable by said financial institution to Borrower, regardless of any loss of interest, charge or penalty as a result of payment before maturity; (g) endorse all checks and other items of remittances received by Sallyport "Pay to the Order of ___(Sallyport)___" or in such other manner as Sallyport may designate; (h) pay, contest or settle any lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (i) grant extensions of time to pay, compromise claims and settle Accounts and the like for less than face value and execute all releases and other documents in connection therewith; (j) pay any sums required on account of Borrower's taxes or to secure the release of any liens therefore, or both; (k) settle and adjust, and give releases of, any insurance claim that relates to any of the Collateral and obtain payment therefore, and make all determinations and decisions with respect to any such policy of insurance and endorse Borrower's name on any check, draft, instrument or other item of payment or the proceeds of such policies of insurance; (l) instruct any accountant or other third party having custody or control of any books or records belonging to, or relating to, Borrower to give Sallyport the same rights of access and other rights with respect thereto as Sallyport has under Section 5.4 of this Agreement; and (m) take any action or pay any sum required of Borrower pursuant to this Agreement, and any other present or future agreements. Any and all sums paid and any and all costs expenses, liabilities, obligations and attorneys' fees incurred by Sallyport with respect to the foregoing shall be added to and become part of the Obligations. In no event shall Sallyport's rights, under the foregoing power of attorney or any of Sallyport's other rights under this Agreement be deemed to indicate that Sallyport is in control of the business, management or properties of Borrower.

       9.    **Online User Standards.**

       9.1    **Online Conducting of Business.** Sallyport and Borrower intend to conduct business contemplated by this Agreement through the internet and through Sallyport's Online Reporting Service. Sallyport is the sole and exclusive owner of the Online Reporting Service. Borrower hereby accepts a non-exclusive, non-transferable right to access the Online Reporting Service, upon the terms and subject to the conditions contained herein.

EXHIBIT A

Page 10 of 18

10

9.2     **Standards Regarding Conducting Business Online.** Borrower and Sallyport agree as follows:

9.2.1     Sallyport shall have the right to terminate Borrower's access to the Online Reporting Service upon the occurrence of an Event of Default or at any other time within Sallyport's discretion.

9.2.2     Borrower shall not: (i) copy the Online Reporting Service nor otherwise reproduce the same other than for normal system operation backup; (ii) translate, adapt, vary, or modify the Online Reporting Service; or (iii) disassemble, decompile or reverse engineer the Online Reporting Service.

9.2.3     Sallyport shall not be liable to Borrower for any loss or damage whatsoever or howsoever caused, whether caused by tort (including negligence), breach of contract, or otherwise arising directly or indirectly in connection with the use of the Online Reporting Service.

9.2.4     Sallyport expressly excludes liability for any indirect, special, incidental or consequential loss or damage whether caused by tort (including negligence), breach of contract or otherwise, which may arise in respect of the Online Reporting Service, its use, or in respect of equipment or property, or for loss of profit, business, revenue, goodwill or anticipated savings.

9.2.5     Borrower acknowledges that any and all of the copyright, trademarks, trade names, patents and other intellectual property rights subsisting in or used in connection with the Online Reporting Service, including all documentation and manuals relating thereto, are, and shall remain, the sole property of Sallyport. Borrower shall not, during or at any time after the expiry or termination of its use of the Online Reporting Service, in any way question or dispute the ownership by Sallyport thereof.

9.2.6     To the extent permitted by applicable law, Sallyport excludes all warranties with respect to the Online Reporting Service, either express or implied, including, but not limited to, any implied warranties of satisfactory quality or fitness for any particular purpose.

9.2.7     Borrower is solely responsible for virus scanning the Online Reporting Service, and Sallyport makes no representations or warranties regarding any virus associated with the Online Reporting Service.

9.2.8     All information, data, drawings, specifications, documentation, software listings, source or object code which Sallyport may have imparted and may from time to time impart to the Borrower relating to the Online Reporting Service is proprietary and confidential. Borrower hereby agrees that it shall use the same solely in accordance with the provisions of this Agreement and that it shall not, at any time during or after expiry or termination of this Agreement, disclose the same, whether directly or indirectly, to any third party.

10.     **General.**

10.1     **True Sale.** Borrower and Sallyport acknowledge and agree that the sale of Accounts contemplated and covered under this Agreement fully intended by the parties hereto as true sales governed by the provisions of Section 306.103 of the Texas Finance Code and Section 9.109(c) of the Texas Business and Commerce Code, as each may be amended from time to time, and, accordingly, legal and equitable title in all of Borrower's accounts sold to and purchased by Sallyport from time to time hereunder will pass to Sallyport."

10.2     **Notices.** Any Written Notice to be given under this Agreement will be in writing addressed to the respective party as set forth in the heading to this Agreement and will be personally served, telecopied or sent by overnight courier service or United States mail and will be deemed to have been given: (a) if delivered in person, when delivered; (b) if delivered by telecopy or e-mail, on the date of transmission if transmitted on a business day before 4:00 p.m. (Central Time) or, if not, on the next succeeding business day; (c) if delivered by overnight courier, two (2) days after delivery to such courier properly addressed; or (d) if by U.S. Mail, four (4) business days after depositing in the United States mail, with postage prepaid and properly addressed. If there is more than one Borrower, notice to any shall constitute notice to all; if Borrower is a corporation, partnership or limited liability company, the service upon any member of the Board of Directors, general partner, managing member, officer, employee or agent shall constitute service upon Borrower.

10.3     **Payment in Full Checks.** Borrower authorizes Sallyport to accept, endorse and deposit on behalf of Borrower any checks tendered by an Account Debtor "in full payment" of its obligation to Borrower. Borrower shall not assert against Sallyport any claim arising therefrom, irrespective of whether such action by Sallyport affects an accord and satisfaction of Borrower's claims, under Section 3-311 of the UCC.

10.4     **No Lien Termination without Release.** In recognition of Sallyport's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by Collateral, notwithstanding payment in full of all Obligations by Borrower, Sallyport shall not be required to record any terminations or satisfactions of any of Sallyport's liens on the Collateral unless and until Borrower has executed and delivered to Sallyport a general release in a form suitable to Sallyport. Borrower understands that this provision constitutes a waiver of its rights under Section 9-513 of the UCC.

10.5     **Indemnity.** Borrower shall indemnify and hold Sallyport harmless from and against any and all claims, debts, losses, demands, actions, causes of action, lawsuits, Avoidance Claims, damages, penalties, liabilities, costs and expenses (including, without limitation, attorneys' fees), of any kind or nature which Sallyport may sustain or incur in connection with, or arising from, this Agreement, any other present or future agreement, or the breach by Borrower of any representation, warranty, covenant or provision contained herein or therein, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Sallyport relating in any way to Borrower. Notwithstanding any other provision of this Agreement to the contrary, the indemnity agreement set forth in this Section shall survive termination of this Agreement. If Borrower fails to honor this Section of the Agreement after termination thereof, Sallyport shall have the right to re-file its UCC-1 financing statement and shall have the right to pursue any and all rights and remedies against Borrower as contemplated by this Agreement, the UCC or any law or in equity. Sallyport may, in its sole discretion, hold or supplement a Reserve to account for any Avoidance Claim.

10.6      **Attorneys' Fees and Costs.** Borrower shall forthwith pay to Sallyport the amount of all actual attorneys' fees and all other costs incurred by Sallyport under and pursuant to this Agreement, or any other present or future agreement, or in connection with any transaction, or with respect to the Collateral or the defense or enforcement of Sallyport's interests (whether or not Sallyport files a lawsuit against Borrower), including any proceedings in Bankruptcy Court. In the event Sallyport files any lawsuit predicated on a breach of this Agreement or is any way related to this Agreement, Sallyport shall be entitled to recover its costs and attorneys' fees, including, but not limited to, attorneys' fees and costs incurred. All attorneys' fees and costs to which Sallyport may be entitled pursuant to this Section shall immediately become part of Borrower's Obligations and be due on demand.

10.7      **Benefit of Agreement.** The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of the parties hereto; provided, however, that Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of Sallyport, and any prohibited assignment shall be void. No consent by Sallyport to any assignment shall relieve Borrower or any guarantor from its liability for the Obligations. Without limiting the generality of the foregoing, all rights and benefits of Sallyport under this Agreement may be exercised by any institution with which Sallyport maintains any rediscount, factoring or other relationship and by any other person or entity designated by Sallyport.

10.8      **Joint and Several Liability.** The liability of each Borrower shall be joint and several and the compromise of any claim with, or the release of, any Borrower shall not constitute a compromise with, or a release of, any other Borrower.

10.9      **General Waivers.** The failure of Sallyport at any time or times hereafter to require Borrower strictly to comply with any of the provisions, warranties, terms or conditions of this Agreement or any other present or future instrument or agreement between Borrower and Sallyport shall not waive or diminish any right of Sallyport thereafter to demand and receive strict compliance therewith and with any other provision warranty, term and condition; and any waiver of any default shall not waive or affect any other default, whether prior or subsequent thereto and whether of the same or of a different type. None of the provisions, warranties, terms or conditions of this Agreement or other instrument or agreement now or hereafter executed by Borrower and delivered to Sallyport shall be deemed to have been waived by any act or knowledge of Sallyport or its agents or employees, but only by a specific written waiver signed by an officer of Sallyport and delivered to Borrower. Borrower waives any and all notices or demands which Borrower might be entitled to receive with respect to this Agreement, or any other agreement by virtue of any applicable law. Borrower hereby waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, release, compromise, settlement, extension or renewal of any commercial paper, instrument, Account, general intangible, document or guaranty at any time held by Sallyport on which Borrower is or may in any way be liable, and notice of any action taken by Sallyport unless expressly required by this Agreement. Borrower hereby ratifies and confirms whatever Sallyport may do pursuant to this Agreement and agrees that Sallyport shall not be liable for the safekeeping of the Collateral or any loss or damage thereto, or diminution in value thereof, from any cause whatsoever, any act or omission of any carrier, warehouseman, bailee, forwarding agent or other person, or any act of commission or any omission by Sallyport or its officers, employees, agents, or attorneys, or any of its or their errors of judgment or mistakes of fact or of law.

10.10      **Section Headings, Construction.** Section headings are used herein for convenience only. Borrower acknowledges that the same may not describe completely the subject matter of the applicable Section, and the same shall not be used in any manner to construe, limit, define or interpret any term or provision hereof. This Agreement has been fully reviewed and negotiated between the parties and no uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Sallyport or Borrower under any rule of construction or otherwise.

10.11      **Destruction of Borrower's Documents, Limitation of Actions.** Any documents, schedules, invoices or other papers delivered to Sallyport may be destroyed or otherwise disposed of by Sallyport six (6) months after the same are delivered to Sallyport, unless Borrower makes written request therefore and pays all expenses attendant to their return, in which event Sallyport return same when Sallyport's actual or anticipated need therefore has terminated. Borrower agrees that any claim or cause of action by Borrower against Sallyport, its directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Agreement, or any other present or future agreement, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Sallyport, its directors, officers, employees, agents, accountants, or attorneys, relating in any way to Borrower, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within six (6) months after the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based, and the service of a summons and complaint on an officer of Sallyport, or on any other person authorized to accept service on behalf of Sallyport, within thirty (30) days thereafter. Borrower agrees that such six-month period provided herein shall not be waived, tolled, or extended except by the written consent of Sallyport, in its sole and absolute discretion. This provision shall survive any termination, however arising, of this Agreement and any other present or future agreement.

10.12      **Severability.** Should any provision, clause or condition of this Agreement be held by any court of competent jurisdiction to be void, invalid, inoperative, or otherwise unenforceable, such defect shall not affect any other provision, clause or condition, and the remainder of this Agreement shall be effective as though such defective provision, clause or condition had not been a part hereof.

10.13      **Integration.** This Agreement and such other written agreements, documents and instruments as may be executed in connection herewith shall be construed together and constitute the entire, only and complete agreement between Borrower and Sallyport, and all representations, warranties, agreements, and undertakings heretofore or contemporaneously made, which are not set forth herein or therein, are superseded hereby.

10.14      **Amendment.** The terms and provisions of this Agreement may not be waived, altered, modified or amended except in a writing executed by Borrower and a duly authorized officer of Sallyport.

10.15      **Time of Essence.** Time is of the essence in the performance by Borrower of each and every obligation under this Agreement.

EXHIBIT A
Page 12 of 18

12

10.16    **Electronic Signatures.**  The parties intend to conduct business contemplated by this Agreement by electronic means. Each document, which is the subject of this Agreement, that a party has transmitted electronically to the other shall be intended as and constitute an original and deemed to contain a valid signature of the party for all purposes acknowledging, consenting to, authorizing and approving the terms of this Agreement or any subject matter applicable thereto.  In furtherance of the above, Borrower hereby authorizes Sallyport to regard the Borrower's printed name or electronic approval for any document, agreement, assignment schedule or invoice as the equivalent of a manual signature by one of the Borrower's authorized officers or agents.  Borrower's failure to promptly deliver to Sallyport any schedule, report, statement or other information required by this Agreement or any document related thereto shall not affect, diminish, modify or otherwise limit Sallyport's security interests in the Collateral or rights and remedies under this Agreement.  Sallyport may rely upon, and assume the authenticity of, any such approval and material applicable to such approval as the duly confirmed, authorized and approved signature of Borrower by the person approving same which constitute an Authenticated Record for purposes of the UCC and shall satisfy the requirements of any applicable statute of frauds.

10.17    **Credit Reports.**  Borrower authorizes Sallyport to obtain credit reports for Borrower and all guarantors at any time, in Sallyport's sole discretion.

10.18    **Governing Law, Jurisdiction; Venue.**  This Agreement and all acts and transactions hereunder and thereunder and all rights and obligations of Sallyport and Borrower shall be governed, construed and interpreted in accordance with the internal laws of the State of Texas.  Borrower: (i) agrees that all actions or proceedings relating directly or indirectly hereto shall, at the option of Sallyport, be litigated in courts located within said state, and, that, at the option of Sallyport, the exclusive venue therefore shall be Harris County, State of Texas; (ii) consents to the jurisdiction and venue of any such court and consents to service of process in any such action or proceeding by personal delivery or any other method permitted by law; and (iii) waives any and all rights Borrower may have to object to the jurisdiction of any such court, or to transfer or change the venue of any such action or proceeding.

10.19    **Waiver of Right to Jury Trial.**  PURCHASER AND SELLER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL IN ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN PURCHASER AND SELLER, AND ANY CONDUCT, ACTS OR OMISSIONS OF PURCHASER OR SELLER OR ANY OF THEIR DIRECTORS, MEMBERS, PARTNERS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILIATED WITH PURCHASER OR SELLER. PURCHASER AND SELLER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. PURCHASER AND SELLER FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[Signatures appear on following page]

EXHIBIT A
Page 13 of 18

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement through their duly authorized officers.

Dated: 2 . 22 , 201 7 (the "Effective Date")

**SALLYPORT COMMERCIAL FINANCE, LLC**

By: _____
Name: _____NICK__ HART_____
Its: _____PRESIDENT_____

*SELLER:*

DATED: _____

WITNESS: _____

DON ROSE OIL CO., INC.

By: _____
Its: _____
            Title

Address:

_____
_____
_____

Telephone number: _____

[Seller signature to be notarized]

EXHIBIT A
Page 14 of 18

14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement through their duly authorized officers.

Dated: _2 · 22_____, 201_7_ (the "Effective Date")

SALLYPORT COMMERCIAL FINANCE, LLC

By:_____
Name:_____
Its:_____

*SELLER:*

DATED: _____

WITNESS: _____

DON ROSE OIL CO., INC.

By: _~John Castellucci~_____
Its: _~CEO~_____
     Title

Address:

_~2035 N. Ben Maddox Way~_____
_~Visalia, CA 93292~_____

Telephone number: _~559 733-4177~_____

[Seller signature to be notarized]

EXHIBIT _A_
Page _15_ of _18_

15

## SCHEDULE A TO ACCOUNT SALE AND PURCHASE AGREEMENT

1.  Advance Rate: up to 90% of the gross face amount of each Eligible Account purchased under this Agreement in advance of its due date. Sallyport may adjust the Advance Rate upward or downward at any time, in its sole discretion.

2.  Audit Fee -- will be charged to client at $800 per day.

3.  Default Rate: a rate per annum equal to ten percent (10%), plus the Interest Rate.

4.  Initial Setup Fee: one percent (1%) of Maximum Facility Limits Amount.

5.  Maximum Facility Limit Amount:  $8,200,000.00 with the following sublimits:

    a.  Inventory Facility: $600,000.00 subject to Inventory Addendum ("Inventory Loan");

    b.  Cashflow facility: $250,000 on a declining base subject to Cash Flow Addendum ("Cashflow Loan");

    c.  Bridge Facility: $2,000,000 subject to Bridge Loan Addendum ("Bridge Loan");

    d.  Term facility: $1,150,000.00 subject to a Term Loan Addendum, that may increase to $1,300,000.00 ("Term Loan").

6.  Minimum Monthly Sales Shortfall Fee: shall be calculated as follows Minimum Monthly Sales Volume for the particular month minus the actual Monthly Sales Volume for the particular month multiplied by the Initial Factoring Fee.

7.  Minimum Monthly Sales Volume:  $3,000,000.00.

8.  Original Term: 24 months ending December 31, 2018.

9.  Place of Business; Location of Collateral: 205 North Ben Maddox Way, Visalia, CA; 361 Terry Avenue, Visalia, CA.

10. Trade Names and Styles:_____.

11. Interest Rate: Base Rate + three percent (3%)

12. Base Rate Floor: three and one-half percent (3.5%)

13. Application of Payments: three (3) days.

14. Management Fee: Sallyport shall earn a management fee (the "Management Fee") equal to $1,000.00 per month on the first day of the month for each month or portion thereof there is any balance outstanding on the Term Loan.  The Management Fee shall be payable, if not sooner paid, on the first day following the month in which the Management Fee was earned.

## SCHEDULE OF COLLATERAL

"Collateral" shall include, and not be limited to, all property of Seller, whether tangible or intangible, real or personal, now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, and whether or not eligible for lending purposes, including: 1) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Seller has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, any Borrower, Guarantor or Pledgor; 2) all Chattel Paper (including Electronic Chattel Paper), Instruments, Documents, and General Intangibles (including all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, payment intangibles, security interests, security deposits and rights to indemnification); 3) all Inventory (whether or not Eligible Inventory); 4) all Goods (other than Inventory), including Equipment, Farm Products, Health-Care-Insurance Receivables, vehicles, and Fixtures; 5) all Investment Property, including, without limitation, all rights, privileges, authority, and powers of Seller as an owner or as a holder of equity whether or not owned or pledged, including, without limitation, all economic rights, all control rights, authority and powers, and all status rights of Seller as a member, equity holder or shareholder, as applicable, of each Issuer; 6) all Deposit Accounts, bank accounts, deposits and cash; 7) all Letter of Credit Rights; all Commercial Tort Claims; 7) all Supporting Obligations; 8) any other property of Seller now or hereafter in the possession, custody or control of Sallyport or any agent or any parent, Affiliate or Subsidiary of Sallyport or any Participant with Sallyport in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), and 8) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including proceeds of all insurance policies insuring the foregoing property, and all of Seller's books and records relating to any of the foregoing and to any Seller's business.

"Collateral" also includes all property and interests in property in or upon which a security interest, mortgage, pledge or other Lien is granted pursuant to this Agreement or the other documents provided in support hereof.

EXHIBIT A
Page 17 of 18

17

Form of Availability Certificate

EXHIBIT $\underline{A}$
Page $\underline{18}$ of $\underline{18}$

18

**BRIDGE LOAN ADDENDUM TO**
**ACCOUNTS SALE AND PURCHASE AGREEMENT**

This Bridge Loan Addendum to Accounts Sale and Purchase Agreement ("Bridge Loan Addendum"), is dated as of February 2, 2017 (the "Effective Date") by and between Sallyport Commercial Finance, LLC ("Sallyport"), a Delaware limited liability company with its principal place of business located at 14100 Southwest Freeway, Suite 210, Sugar Land, Texas 77478 and Don Rose Oil Co., Inc., a California corporation, whose office is located at 205 N. Ben Maddox Way, Visalia, CA 93292 (the "Seller"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Accounts Sale and Purchase Agreement ("ASPA") of even date herewith entered into between Sallyport and Seller.

RECITALS

WHEREAS, Sallyport and Seller are parties to the ASPA, as amended, modified, supplemented or restated from time to time, pursuant to which Sallyport has purchased or will purchase, in its discretion, Accounts from Seller.

WHEREAS, in conjunction with the ASPA, Seller has requested that Sallyport provide Seller with a short term loan within the ASPA for the purpose of facilitating the use of cash for general working capital and general corporate purposes, all in the ordinary course of its business (the "Bridge Loan").

WHEREAS, Sallyport is willing to provide Bridge Loan financing pursuant to the terms and conditions set forth in this Addendum, which Addendum shall become and is now part of the ASPA.

Now, therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, and with the intent to be legally bound thereby, Sallyport and Seller, with the consent of Guarantors, hereby agree as follows:

1.    Definitions.  In addition to the definitions contained in the Agreement, the first paragraph of this Rider and in the recitals to this Rider, the following terms are specifically defined for use herein:

1.1    "Event of Default" shall have the meaning set forth in Section 7.1 of the ASPA.

1.2    "Bridge Loan" shall have the meaning set forth in Section 2 of this Rider.

2.    Bridge Loan.  The Bridge Loan shall mean that certain balance due in the principal amount of Two Million Seven Hundred Twenty Thousand and no/100 Dollars ($2,720,000.00).

3.    Interest on the Bridge Loan.  The Bridge Loan shall bear interest at a rate of three percent (3.0%) per annum above the Base Rate on the principal balance outstanding.  Upon the occurrence of an Event of Default, the Bridge Loan shall be subject to the Default Interest Rate pursuant to the Agreement.

4.    Bridge Loan Fee.  A Bridge Loan Fee in the amount of Four Hundred Eight Thousand and no/100 Dollars ($408,000.00) shall be fully earned and due Sallyport upon the execution of this Bridge Loan Addendum.

5.    Bridge Loan, Interest and Fees included in Obligations.  The Bridge Loan, as well as all of the interest accrued thereon and fees related thereto, shall be deemed included in the "Obligations" and shall be secured by the Collateral pursuant to the terms of the Agreement.

6.    Payment Terms.  The Bridge Loan shall be subject to the repayment terms contained in this Section.

EXHIBIT B
Page 1 of 4

19

6.1    Seller shall repay the Bridge Loan, and the interest thereon, as follows:

A.    Absent an Event of Default, on or before the end of the Original Term, Seller, shall pay to Sallyport interest accrued on the principal amount outstanding on the Bridge Loan of the first day of each month commencing on the first day of the month occurring in the month following the expiration of 60 days from the date of this Bridge Loan Addendum.

B.    If not sooner paid, absent an Event of Default, Seller shall pay to Sallyport the outstanding principal balance of the Bridge Loan and the Bridge Loan Fee on the date that Seller closes the sale of its assets that Seller and Sallyport commonly refers to as Seller's "Propane Division" or the assets of DRO Barite, LLC ("Barite Assets"). If either the Propane Division or Barite Assets sale does not close within 60 days from the date of this Bridge Loan Addendum, the principal amount outstanding shall accrue interest at the Default Rate.

6.2    Notwithstanding the provisions of Section 6.1 to the contrary, the outstanding principal balance of the Bridge Loan, all accrued and unpaid interest thereon, and the Bridge Loan Fee will be immediately due and payable (and in the case of the Bridge Loan Fee, immediately payable) upon the termination of the ASPA, regardless of how such termination occurs. In the event the ASPA has not been terminated prior to January 31, 2018, then all principal, interest and fees outstanding pursuant to this Bridge Loan Addendum shall all be due and payable in full on January 31, 2018.

7.    Voluntary Prepayment.  Seller may prepay principal amounts outstanding on the Bridge Loan at any time without premium.

8.    Conditions Precedent.  This Bridge Loan Addendum shall become effective upon execution and delivery of this Bridge Loan Addendum by Seller.

9.    Conditions Subsequent.  Seller and Sallyport shall negotiate and endeavor in good faith to enter into a written agreement, to be entered into within 15 business days of the execution of this Bridge Loan Addendum or as soon thereafter as practicable, for issuance by Seller to Sallyport of a warrant for common shares in Seller representing Thirty Percent (30%) of the issued and outstanding shares of Seller ("Sallyport Shares") on a fully diluted basis, after giving effect to the cancellation of the shares issued to Donald Duane Rose and Janice Marie Rose (the "Rose Shares") pursuant to the Settlement Agreement with Hellenic and other parties thereto, with such other commercially reasonable terms and conditions governing the term, anti-dilution, exercise price and other provisions that the parties may mutually agree upon. At all times from and after the execution of the Bridge Loan Addendum and during the time that Sallyport is entitled to exercise the warrant or owns the Sallyport Shares, Seller covenants and agrees that Seller shall not issue any warrant for any other shares of any type or class in Seller and any action in violation of this covenant shall be an Event of Default under the ASPA; provided, however, that shares issued to an affiliate of Gifford's Market, Inc. in an amount equal to the Rose Shares shall not be deemed to violate this covenant, subject to the requirement that any shares issued during the time that there is a balance due Sallyport must be pledged as collateral for the amounts due Sallyport, the failure of which shall be an Event of Default under the ASPA. The failure by Seller to enter in an agreement for issuance of the warrants with Sallyport within 15 business days of the execution of this Bridge Loan Addendum to the extent such failure was not caused by Sallyport shall be an Event of Default under the ASPA.

10.    Seller's Representations and Warranties.  Seller makes the following representations and warranties which shall be deemed to be continuing representations and warranties so long as this Bridge Loan remains in effect and until the Obligations have been repaid in full:

10.1    Due Authorization.  This Bridge Loan has been duly authorized by the Board of Seller and the officer(s) executing this Bridge Loan Addendum on behalf of Seller has been duly authorized to do so by the Board of Seller.

(b) are not in contravention of or in conflict with any law or regulation; and (c) do not cause any lien, charge or other encumbrance to be created or imposed upon any such property by reason thereof.

11.  <u>Binding Agreement</u>.  This Bridge Loan Addendum shall be binding and deemed effective when executed by Seller and accepted and executed by Sallyport.

12.  <u>Section Headings</u>.  Section headings and section numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Bridge Loan Addendum.

13.  <u>Interpretation</u>.  Neither this Bridge Loan Addendum nor any uncertainty or ambiguity herein shall be construed or resolved against Sallyport or Seller, whether under any rule of construction or otherwise.  On the contrary, this Bridge Loan Addendum has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

14.  <u>Severability</u>.  Each provision of this Bridge Loan Addendum shall be severable from every other provision of this Rider for the purpose of determining the legal enforceability of any specific provision.

15.  <u>Modification and Merger</u>.  This Bridge Loan Addendum cannot be changed or terminated orally.  All prior agreements, understandings, representations, warranties and negotiations, if any, relating to the Siena Balance are merged into this Bridge Loan Addendum.

16.  <u>Incorporation into Agreement</u>.  This Bridge Loan Addendum and all of the terms, covenants, warranties, conditions, agreements and representations contained herein are incorporated into and deemed part of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Bridge Loan Addendum as of the date first hereinabove written.

**SALLYPORT**

SALLYPORT COMMERCIAL FINANCE, LLC

By:_____
Name:_____
Its:_____

*SELLER:*

DON ROSE OIL CO., INC.

By:_____
Name:_____
Its:_____

[Seller signature to be notarized]

2353-010.556987                        EXHIBIT 3 _B_                    Bridge Loan Addendum
                                       Page _3_ of _4_

21

10.2   Binding Agreement.  This Bridge Loan Addendum is the valid, binding and legally enforceable obligation of Seller in accordance with its terms.

10.3   No Conflict.  The execution, delivery and performance by Seller of this Bridge Loan Addendum: (a) shall not constitute an event of default under any agreement, indenture or undertakings to which Seller is a party or by which Seller or any of its property may be bound or affected; (b) are not in contravention of or in conflict with any law or regulation; and (c) do not cause any lien, charge or other encumbrance to be created or imposed upon any such property by reason thereof.

11.   Binding Agreement.  This Bridge Loan Addendum shall be binding and deemed effective when executed by Seller and accepted and executed by Sallyport.

12.   Section Headings.  Section headings and section numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Bridge Loan Addendum.

13.   Interpretation.  Neither this Bridge Loan Addendum nor any uncertainty or ambiguity herein shall be construed or resolved against Sallyport or Seller, whether under any rule of construction or otherwise.  On the contrary, this Bridge Loan Addendum has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

14.   Severability.  Each provision of this Bridge Loan Addendum shall be severable from every other provision of this Rider for the purpose of determining the legal enforceability of any specific provision.

15.   Modification and Merger.  This Bridge Loan Addendum cannot be changed or terminated orally.  All prior agreements, understandings, representations, warranties and negotiations, if any, relating to the Siena Balance are merged into this Bridge Loan Addendum.

16.   Incorporation into Agreement.  This Bridge Loan Addendum and all of the terms, covenants, warranties, conditions, agreements and representations contained herein are incorporated into and deemed part of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Bridge Loan Addendum as of the date first hereinabove written.

**SALLYPORT**

SALLYPORT COMMERCIAL FINANCE, LLC

By: _____
Name: NICK HART
Its: PRESIDENT

**SELLER:**

DON ROSE OIL CO., INC.

By: _____
Name: Castellani
Its: CEO

[Seller signature to be notarized]

2353-010.555987                              3                              Bridge Loan Addendum

EXHIBIT B
Page 4 of 4

22

### CASH FLOW ADDENDUM TO
### ACCOUNTS SALE AND PURCHASE AGREEMENT

This Cash Flow Addendum to Accounts Sale and Purchase Agreement (this "Cash Flow Addendum"), is dated as of January 7, 2017 (the "<u>Effective Date</u>") by and between Sallyport Commercial Finance, LLC ("Sallyport"), a Delaware limited liability company with its principal place of business located at 14100 Southwest Freeway, Suite 210, Sugar Land, Texas 77478 and Don Rose Oil Co., Inc., a California corporation, whose office is located at 205 N. Ben Maddox Way, Visalia, CA 93292 (the "Seller"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Accounts Sale and Purchase Agreement ("ASPA") of even date herewith entered into between Sallyport and Seller.

### RECITALS

WHEREAS, Sallyport and Seller are parties to the ASPA, as amended, modified, supplemented or restated from time to time, pursuant to which Sallyport has purchased or will purchase, in its discretion, Accounts from Seller.

WHEREAS, in conjunction with the ASPA, Seller has requested that Sallyport provide Seller with a revolving line within the ASPA for the purpose of facilitating the use of cash for general working capital and general corporate purposes, all in the ordinary course of its business (the "Cash Flow Loan").

WHEREAS, Sallyport is willing to provide Cash Flow Loan financing pursuant to the terms and conditions set forth in this Addendum, which Addendum shall become and is now part of the ASPA.

Now, therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, and with the intent to be legally bound thereby, Sallyport and Seller, with the consent of Guarantors, hereby agree as follows:

1.     <u>Definitions</u>. In addition to the definitions contained in the Agreement and elsewhere in this Cash Flow Addendum, the following terms are specifically defined for use herein:

        1.1     "<u>Event of Default</u>" shall have the meaning set forth in Section 7.1 of the ASPA.

2.     <u>Cash Flow Loan</u>. Upon the request of Seller, and so long as there is availability under the terms of the Agreement and no Event of Default has occurred and is continuing, Sallyport may, but is not required to, make a term loan to Seller in the amount of not to exceed $250,000.00 on a revolving basis, in its sole discretion. The amount available for advance hereunder, if not advanced, shall be reduced by the amount of $10,416.67 each month. The aggregate amount that can be borrowed once the amount available in any month has not been advanced in full, the Cash Flow Loan.

3.     <u>Interest on the Cash Flow Loan</u>. The Cash Flow Loan shall bear interest at the Base Rate plus twelve percent (12%) per annum on the principal balance outstanding. Upon the occurrence of an Event of Default, the Cash Flow Loan shall be subject to the Default Interest Rate pursuant to the Agreement.

4.     <u>Cash Flow Loan and Interest included in Obligations</u>. The Cash Flow Loan, as well as all of the interest accrued thereon, shall be deemed included in the "Obligations" and shall be secured by the Collateral pursuant to the terms of the Agreement; <u>provided</u>, that the proceeds of the Collateral shall be applied to all Obligations other than the Term Loan first before being applied to the Term Loan.

5.     <u>Payment Terms</u>. The Cash Flow Loan shall be subject to the repayment terms contained in this Section.

        5.1     Seller shall repay the Cash Flow Loan, and the interest thereon, as follows:

EXHIBIT C
Page 1 of 4

23

A.    Absent an Event of Default, on or before the end of the Original Term, Seller, shall pay to Sallyport amounts equal to principal as if amortized on a declining basis such that principal will be repaid in equal amounts each month until paid in full plus all interest accrued on the outstanding principal balance of the Cash Flow Loan of the first day of each month. By way of example, if the entire sum is drawn down in the first month, the principal payment would be $10,419.67 each month. If $100,000 was drawn down in the first month, the principal payment would be $4,166.67 each month so long as no additional advances were made. If an additional $25,000 was advanced in the third month, the total outstanding would be $100,000 minus (2 months principal payments times $4,166.67 or $8,333.34) + $25,000 = $116,666.67 divided by 22 months remaining = $5,303.03 principal plus interest. So there is no misunderstanding, the principal amount outstanding at the end of each month may not excess the maximum amount then available for borrowing under the Cash Flow Loan.

B.    If not sooner paid, absent an Event of Default, Seller shall pay to Sallyport the remaining outstanding principal balance of the Cash Flow Loan, together with all accrued and unpaid interest thereon on the last day of the Original Term.

5.2    Notwithstanding the provisions of Section 5.1 to the contrary, the outstanding principal balance of the Cash Flow Loan, and all accrued and unpaid interest thereon, will be immediately due and payable upon the termination of the Agreement, regardless of how such termination occurs.

6.    Voluntary Prepayment.  Seller may prepay principal amounts outstanding on the Cash Flow Loan at any time.  Such payment will be first applied to the interest then outstanding on the Cash Flow Loan and thereafter to the payments due on principal in inverse order (last to first), such that the monthly principal amount shall not change until the last payment of principal is to be made.

7.    Conditions Precedent.  This Cash Flow Loan Addendum shall become effective upon execution and delivery by Seller this letter and the fully executed Agreement.

8.    Seller's Representations and Warranties.  Seller makes the following representations and warranties which shall be deemed to be continuing representations and warranties so long as this Cash Flow Loan remains in effect and until the Obligations have been repaid in full:

8.1    Due Authorization.  This Cash Flow Loan has been duly authorized by the Board of Seller and the officer(s) executing this Cash Flow Loan Addendum on behalf of Seller has been duly authorized to do so by the Board of Seller.

8.2    Binding Agreement.  This Cash Flow Loan Addendum is the valid, binding and legally enforceable obligation of Seller in accordance with its terms.

8.3    No Conflict.  The execution, delivery and performance by Seller of this Term Loan Addendum: (a) shall not constitute an event of default under any agreement, indenture or undertakings to which Seller is a party or by which Seller or any of its property may be bound or affected; (b) are not in contravention of or in conflict with any law or regulation; and (c) do not cause any lien, charge or other encumbrance to be created or imposed upon any such property by reason thereof.

9.    Binding Agreement.  This Cash Flow Loan Addendum shall be binding and deemed effective when executed by Seller and accepted and executed by Sallyport.

10.    Section Headings.  Section headings and section numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Cash Flow Loan Addendum.

11.    Interpretation.  Neither this Term Loan Addendum nor any uncertainty or ambiguity herein shall be construed or resolved against Sallyport or Seller, whether under any rule of construction or otherwise. On the contrary, this Cash Flow Loan Addendum has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

12.      <u>Severability</u>.  Each provision of this Cash Flow Loan Addendum shall be severable from every other provision of this Rider for the purpose of determining the legal enforceability of any specific provision.

13.      <u>Modification and Merger</u>.  This Cash Flow Loan Addendum cannot be changed or terminated orally.  All prior agreements, understandings, representations, warranties and negotiations, if any, relating to the Cash Flow Loan are merged into this Cash Flow Loan Addendum.

14.      <u>Incorporation into Agreement</u>.  This Cash Flow Loan Addendum and all of the terms, covenants, warranties, conditions, agreements and representations contained herein are incorporated into and deemed part of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Cash Flow Loan Addendum as of the date first hereinabove written.

**SALLYPORT**

SALLYPORT COMMERCIAL FINANCE, LLC

By:_____

Name: NICK HART

Its: PRESIDENT

*SELLER:*

DON ROSE OIL CO., INC.

By:_____

Name:_____

Its:_____

[Seller signature to be notarized]

EXHIBIT C
Page 3 of 4

25

12. _Severability_. Each provision of this Cash Flow Loan Addendum shall be severable from every other provision of this Rider for the purpose of determining the legal enforceability of any specific provision.

13. _Modification and Merger_. This Cash Flow Loan Addendum cannot be changed or terminated orally. All prior agreements, understandings, representations, warranties and negotiations, if any, relating to the Cash Flow Loan are merged into this Cash Flow Loan Addendum.

14. _Incorporation into Agreement_. This Cash Flow Loan Addendum and all of the terms, covenants, warranties, conditions, agreements and representations contained herein are incorporated into and deemed part of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Cash Flow Loan Addendum as of the date first hereinabove written.

**SALLYPORT**

SALLYPORT COMMERCIAL FINANCE, LLC

By:_____
Name:_____
Its:_____

*SELLER:*

DON ROSE OIL CO., INC.

By:_____
Name:_____
Its:_____

[Seller signature to be notarized]

2353-010/550087

EXHIBIT _C_
Page _4_ of _4_

Cash Flow Addendum

26

### INVENTORY LOAN ADDENDUM
### TO ACCOUNT SALE AND PURCHASE AGREEMENT

**THIS INVENTORY LOAN ADDENDUM TO ACCOUNTS SALE AND PURCHASE AGREEMENT** (this "<u>Addendum</u>") dated as of January 22, 2017 (the "<u>Effective Date</u>") by and between Sallyport Commercial Finance, LLC, ("Sallyport"), a Delaware limited liability company with its principal place of business located at 14100 Southwest Freeway, Suite 210, Sugar Land, Texas 77478 and Don Rose Oil Co., Inc., a California corporation, whose office is located at 205 N. Ben Maddox Way, Visalia, CA 93292 (the "Seller"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Accounts Sale and Purchase Agreement ("ASPA") of even date herewith entered into between Sallyport and Seller.

### RECITALS

Whereas, Sallyport and Seller are parties to the ASPA, as amended, modified, supplemented or restated from time to time, pursuant to which Sallyport has purchased or will purchase, in its discretion, Accounts from Seller.

Whereas, in conjunction with the ASPA, Seller has requested that Sallyport finance Seller's Inventory for the purpose of facilitating the purchase of Inventory, general working capital and general corporate purposes, all in the ordinary course of its business.

Whereas, Sallyport is willing to provide Inventory financing pursuant to the terms and conditions set forth in this Addendum, which Addendum shall become and is now part of the ASPA.

Now, therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, and with the intent to be legally bound thereby, Sallyport and Seller, with the consent of Guarantors, hereby agree as follows:

### SECTION I. RECITALS; DEFINITIONS

1.1     <u>Recitals</u>. The foregoing recitals are true and correct and incorporated herein by this reference.

1.2     <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings:

"<u>Advance</u>" shall mean the amount of funds advanced by Sallyport to Seller hereunder.

"<u>Affiliate</u>" shall mean any person, corporation, association or other business entity which directly or indirectly controls, or is controlled by, or is under common control with Seller.

"<u>ASPA Advances</u>" shall mean the amount Sallyport may pay Seller (the Seller as defined in the ASPA) upon delivery of Accounts offered for sale based upon the applicable Advance Rate as defined in the ASPA.

"<u>Borrowing Base</u>" shall mean an amount not to exceed the Maximum Inventory Loan Amount, which shall be calculated as the lesser of (i) Seventy-Five percent (75%) of the net orderly liquidation value of Eligible Inventory; or (ii) Fifty percent (50%) of cost of the Eligible Inventory. Sallyport has bargained for and Seller agrees and acknowledges that the value of Inventory not included in the Borrowing Base is included as the collateral value in excess of the Advances.

"<u>Borrowing Base Certificate</u>" shall mean a certificate prepared by Seller in substantially the form attached hereto as Exhibit "A" and incorporated herein by this reference.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday, public holiday under the laws of the State of California or other day on which Sallyport is not open for business in Houston Texas.



EXHIBIT D
Page 1 of 18

27

"Closing Fee" shall be waived.

"Eligible Inventory" shall mean all Inventory which is owned by the Seller, excluding the following: (a) Inventory subject to a prior security interest held by a third party;  (b) Inventory consisting of packaging, shipping materials or supplies; (c) Inventory determined by Sallyport or the Seller to be not in good condition, slow-moving, obsolete or not currently usable or salable in the ordinary course of the Seller's business; (d) Finished goods inventory which do not meet the customer specifications; (e) Finished goods inventory consisting of Finished goods held pursuant to a consignment arrangement; (f) Inventory with respect to which Sallyport does not have a first and valid fully perfected security interest; (g) Inventory not in compliance with any representation or warranty made in this Addendum, and/or the ASPA, (h) work-in-process; or (i) Inventory which sales are subject to contra-account liability with the purchaser of such Inventory.  Eligible Inventory must be stored in one of the locations set forth in the attached Schedule 4.9, Schedule of Inventory Locations. Eligible Inventory shall be valued, for purposes of this Addendum, at the lower of cost or market value. The eligibility of Inventory shall be determined by Sallyport in its sole discretion.

"Events of Default" shall have the meaning ascribed to such term in Section 7 hereof.

"Financing Documents" shall mean, singularly or collectively as the context may require: (i) this Addendum; (ii) the ASPA; (iii) any personal guaranties on behalf of Seller, including but not limited to that Continuing Guaranty made by Castle Energy Inc., John Castellucci, Linda Castellucci, Robert K. Moore, Debora L. Moore, Donald  D. Rose, and Janice M. Rose, in favor of Sallyport; (iv) any UCC-1 financing statements filed naming Seller as Debtor and Sallyport as Secured Party or any UCC-3 financing statement assignments naming Seller as Debtor and Sallyport as Secured Party; and (v) any and all other documents, instruments, certificates and agreements executed and delivered in connection with any of the foregoing or previously provided that support any of the foregoing, as any of them may be amended, modified, extended or supplemented from time to time.

"Finished Goods Inventory" shall mean products that are completed and are waiting to be sold to customers.

"GAAP" shall mean generally accepted accounting principles applied on a consistent basis.

"Intellectual Property" shall mean the following property owned or licensed (as licensor or licensee) by Seller in which Seller has a proprietary interest: (i) Seller's name, all fictional business names, trade names, domain names, registered and unregistered trademarks, service marks, pending registration applications with respect thereto and all common law rights and goodwill associated therewith; (ii) Seller's logos, designs, trade dress, domain names and other brand designations; (iii) all patents, patent applications and inventions and discoveries whether or not patentable; (iv) all registered and unregistered copyrights in both published and unpublished works; (v) all rights in Internet web sites presently used by Seller, as well as telephone, telecopy and e-mail addresses and listings; and (vi) any licensing agreement entered by Seller.

"Inventory" shall have the meaning ascribed to such term in the UCC, including, without limitation, all Inventory held for sale, all accessions, additions, substitutions and replacements thereto and therefore and shall, without limitation, include Inventory in Transit, Raw Material Inventory and Finished Goods Inventory.

"Inventory Funding Fee" shall mean a fee of Ten Percent (10%) above the Prime Rate for each Advance made hereunder, which Prime Rate shall be calculated daily on the total Advances outstanding hereunder.

"Inventory in Transit" shall mean Inventory that is owned by the Seller and is in transit and (i) for which Sallyport has control over such Inventory, including the marine bill of lading and associated documents in the name of Sallyport or in Sallyport's possession; (ii) reporting of such Inventory in Transit satisfactory to Sallyport in its sole discretion; and (iii) which Inventory is insured and Sallyport is named as loss payee by endorsement with the insurance carrier.



EXHIBIT D
Page 2 of 18

28

"Inventory Loan" or "Inventory Loans" shall mean the loans made by Sallyport to the Seller under this Addendum in Sallyport's sole and absolute discretion.

"Lien" shall mean any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature, including, but not limited to, any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

"Maturity Date" shall mean, unless sooner demanded by Sallyport after the occurrence of an Event of Default hereunder, the initial one (1) year anniversary from the Effective Date and any renewal hereunder.

"Maximum Inventory Loan Amount" shall mean an amount not to exceed Six Hundred Thousand Dollars ($600,000.00).

"Notice of Borrowing" shall have the meaning as set forth in Section 2.2 of this Agreement.

"Parties" shall refer herein to Sallyport and Seller; each may be referred to herein as a "Party".

"Permitted Encumbrances" means the items listed in Schedule 1.2.

"Permitted Liens" means: (a) liens for taxes, assessments and similar charges which are not delinquent or are being contested in good faith, and as to which Seller shall have set aside on its books adequate reserves; and (b) any such Permitted Encumbrances existing as of the date hereof as agreed to in writing by Sallyport.

"Potential Default" means any event or condition which with notice or the passage of time would constitute an Event of Default.

"Prime Rate" shall mean the "prime rate" as published in *The Wall Street Journal* (Eastern Edition) in its "Money Rates" column or, if no longer published as such, the rate of interest announced from time to time by any other bank selected by Sallyport, as its prime rate, base rate, or reference rate. If *The Wall Street Journal* publishes more than one "prime rate" under its "Money Rates" column, then the Prime Rate shall be the highest of such rates. Any adjustment in the Prime Rate, whether downward or upward, will become effective on the first day of the month following the month in which the Prime Rate is reduced or increased.

"Raw Material Inventory" shall mean all component parts currently in stock that have not yet been used in work-in-process or finished goods production.

Unless the context requires otherwise, words of the masculine gender shall be construed to include correlative words of the feminine and neuter genders and vice versa, words of the singular number shall be construed to include correlative words of the plural number and vice versa, and "including" (and with the correlative meaning "include") means including without limiting the generality of any description preceding such term. This Addendum and all terms and provisions hereof shall be liberally construed to effect the purposes set forth herein and to sustain the validity.

## SECTION 2.    INVENTORY LOAN

2.1    Revolving Inventory Loan. Subject to the terms and conditions contained herein, Sallyport will establish for Seller a revolving line of credit against which Sallyport may make Advances from time to time, in Sallyport's sole and absolute discretion, for the purpose of providing working capital to Seller through Inventory Loans. Subject to the terms hereof, Seller shall have the right to request Advances, repay Advances and obtain additional Advances; *provided, however,* all of the Advances hereunder shall be viewed as a single Inventory Loan. At no time shall the unpaid principal balance of the Inventory Loan exceed the Maximum Inventory Loan Amount and all accrued interest and any fees and costs provided for herein. All Advances of the Inventory Loan shall be made on or before the Maturity Date.  Within the limits of time and amount set forth herein and subject to the provisions of this Agreement, including,



EXHIBIT D
Page 3 of 18

29

without limitation, Sallyport's right to demand repayment of the Inventory Loan upon the occurrence of an Event of Default, the Seller may borrow, repay and reborrow under this Section 2. The Seller shall use the proceeds of the Inventory Loan for general working capital and general corporate purposes.

2.2  Advances. Subject to the terms and conditions hereof, Advances of the Inventory Loan, if any, will be made in amounts not to exceed the amount calculated in accordance with the Borrowing Base as set forth in the Borrowing Base Certificate. In calculating the Borrowing Base, only Eligible Inventory shall be used. On any Business Day when the Seller desires that Sallyport make an Inventory Loan, Seller shall provide to Sallyport a notice for the requested Inventory Loan (a "Notice of Borrowing"). Each Notice of Borrowing required pursuant to this Section shall be given in writing and shall be given no later than 9 a.m. CST, on the day such Inventory Loan is to be made, and shall be signed by an officer of the Seller or any employee who has been designated by an authorized person having the authority to deliver a Notice of Borrowing, and, in any event, shall include: (i) the date (which shall be a Business Day) on which the Inventory Loan is to be made; (ii) the principal amount of the Inventory Loan; and (iii) the documentation set forth in Section 6.5(a). Subject to the terms and conditions of this Agreement, upon Sallyport's review, approval and processing of the required Notice of Borrowing and any other information requested by Sallyport, Sallyport shall make the proceeds of the Inventory Loan available to the Seller on the date specified in the Notice of Borrowing, in funds immediately available. Notwithstanding the foregoing, any Inventory Loan may be made by Sallyport in good faith reliance upon a telephonic or electronic mail request under this Agreement, *provided, however,* that Sallyport shall have the right to request that the Seller confirm such telephonic or electronic mail request for an Inventory Loan in writing. Such Advances may be borrowed, re-paid and re-borrowed, *provided, however,* the aggregate outstanding principal amount of all Advances shall not exceed Maximum Inventory Loan Amount. On or after the Effective Date until the Maturity Date, or until the occurrence of an event which with the giving of notice or the passage of time, or both, shall constitute an Event of Default, Seller shall be entitled to borrow, repay or prepay and reborrow, by delivering to Sallyport a request for Advance in accordance herewith.

2.3  Inventory Funding Fee. Each Advance shall be assessed an Inventory Funding Fee at the time such Advance is made. Seller hereby authorizes Sallyport to pay any amount due and owing under the Inventory Loan from any amounts that would otherwise be payable to Seller under this Addendum or the ASPA.

2.4.  Payments. The Inventory Loan shall be paid in full upon the earlier to occur of (i) the demand by Sallyport, or (ii) through the application of amounts payable to Seller for the purchase of Accounts pursuant to the ASPA traceable to inventory sold for which an Advance was made to Seller hereunder, or (iii) future written agreements of Sallyport to repay any Advance or portion thereof on terms other than as provided herein, or (iv) at the option of Sallyport in its sole discretion, upon an Event of Default hereunder, or (v) the termination of this Addendum for any reason.

2.5  Prepayments. If for any reason the aggregate Advances outstanding together with all outstanding fees due hereunder at any time shall exceed the Maximum Inventory Loan Amount, Seller, without notice or demand, shall immediately make a principal payment to Sallyport in an amount equal to such excess. Seller hereby authorizes Sallyport to pay any amount due and owing under the Inventory Facility from any amounts that would otherwise be payable to Seller under this Addendum or the ASPA.

2.6  Usury Savings Clause. In the event there is a final judicial determination that the Inventory Funding Fee exceeds the maximum rate of interest permitted by applicable usury or similar laws, its application will be suspended and there will be charged instead the maximum rate of interest permitted by such laws. Any interest which has been collected by Sallyport in excess of the maximum rate of interest permitted by applicable usury or similar laws prior to the suspension of such interest rates shall be applied to the principal balance of the Inventory Loan.

2.7  Inventory Loan Amounts. Sallyport shall make appropriate debits and credits to the inventory facility of Seller corresponding to each Advance to reflect the Advances to, payments by and other disbursements for the account of Seller, the Inventory Funding Feet and any fees and costs provided for herein. Each such entry shall be prima facie evidence of the principal amount of Advances hereunder at any time outstanding and the interest due and owing.

EXHIBIT D
Page 4 of 18

30

2.8    <u>Closing Fee</u>. The Closing Fee shall be waived.

2.9    <u>ASPA Advances</u>. Seller hereby authorizes Sallyport to pay any amount due and owing hereunder from any amounts that would otherwise be payable to Seller under the ASPA.

## SECTION 3.    GRANT OF SECURITY INTEREST

As security for the payment and the performance of the Inventory Loan, Seller extends, sells, assigns, conveys, mortgages, pledges, transfers, grants, and re-grants to Sallyport a continuing, first priority security interest in and to all of its respective rights, title and interest in, to and under all the Collateral. With respect to the Intellectual Property, Seller (i) agrees it shall not pledge the Intellectual Property as collateral to any third party for so long as there are Obligations due and owing to Sallyport by Seller; and (ii) transfers, assigns, conveys and delivers to Sallyport, its successors and assigns, a limited, non-exclusive, irrevocable and worldwide license to use the Intellectual Property for the purposes of listing, selling or liquidating the Collateral or otherwise collecting the Obligations.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Sallyport as follows:

4.1    <u>Organization, Standing, Company Powers</u>

(a)    <u>Duly Organized</u>. Seller (i) is an entity duly organized, validly existing and in good standing under the laws of the state of its formation; (ii) has all requisite power and authority, as a limited liability company or otherwise, to conduct its business as now being conducted and to own its properties and assets; and (iii) is duly qualified to do business in every jurisdiction wherein the failure to so qualify would have a material adverse effect.

(b)    <u>Powers</u>. Seller has all requisite power and authority, limited liability company or otherwise, to execute, deliver, and to perform all of its obligations under this Addendum and under other documents or agreements relating to the transactions contemplated herein to which it is a party.

(c)    <u>Binding Obligation</u>. This Agreement, the ASPA, and all guarantees, assignments, security agreements and all documents executed in connection therewith are legal, valid and binding obligations of Seller and enforceable in accordance with their respective terms, subject to the enforcement of remedies to bankruptcy, insolvency and other laws affecting creditors' rights generally and to moratorium laws, from time to time in effect, and to general equitable principles which may limit the right to obtain the remedy of specific performance.

4.2    <u>Authorization of Borrowing.</u> The execution, delivery and performance of this Addendum and the borrowings hereunder: (a) have been duly authorized by all requisite company action; (b) will not violate any provision of applicable law, any governmental rule or regulation, any order of any court or other agency of government to which Seller is subject or the organic documents of Seller; or (c) do not violate any provision of any indenture, agreement or other instrument to which Seller is a party or by which Seller or its properties or assets are bound and which is material to the conduct or operation of Seller's business and financial affairs, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any provision of such indenture, agreement or other instruments, or result in the creation or imposition of any Lien, charge or encumbrance of any nature whatsoever upon the property or assets of Seller, other than as provided herein.

4.3    <u>Financial Statements</u>. Seller has heretofore furnished to Sallyport financial statements which fairly present the financial condition and the results of operations of Seller as of the date and for the period indicated, show all known material liabilities, direct or contingent, as of the respective dates thereof, and were prepared in accordance with GAAP.

EXHIBIT _D_
Page _5_ of _18_

31

4.4    Adverse Change, etc. There has been no material adverse change in the business, properties or condition (financial or otherwise) of Seller since the date of the most recent of the financial statements delivered to Sallyport.

4.5    Litigation. Except for the litigation identified on the attached Schedule 4.5, (the "Schedule of Litigation"), there are no actions, suits or proceedings pending or threatened against or affecting Seller, at law or in equity, or before or by any Federal, state, municipal or other governmental court, tribunal, department, commission, board, bureau, agency or instrumentality, domestic or foreign, which involve any of the transactions herein contemplated or the possibility of any judgment or liability which would result in any material adverse change in the business, operations, properties or assets or in the financial condition of Seller, or materially and adversely affect the ability of any of them to perform hereunder. Seller is not in default with respect to (a) any judgment, order, writ, injunction or decree; or (b) any rule or regulation of any court or Federal, state, municipal or other governmental court, tribunal, department, commission, board, bureau, agency or instrumentality, domestic or foreign which would have a material adverse effect on its business, properties or condition (financial or otherwise).

4.6    Payments of Taxes.   Seller has filed or caused to be filed all Federal, state and local tax returns that are required to be filed and has paid or caused to be paid all taxes as shown on such returns or on any assessment received by it, to the extent that such taxes have become due, except taxes the validity of which is being contested in good faith by appropriate proceedings and for which, in the exercise of reasonable business judgment, there have been set aside adequate reserves with respect to any such tax or assessment so contested the tax or assessment so contested shall not materially affect its ability to perform hereunder.

4.7    Priority of Security Interest.   Subject (a) to filing and recordation of the appropriate instruments in the appropriate offices of the proper jurisdiction or possession by Sallyport or its agent where perfection is based upon possession; (b) to the enforcement of remedies to bankruptcy, insolvency, and other laws affecting creditors' rights generally and to moratorium laws, from time to time in effect; and (c) to general equitable principles which may limit the right to obtain the remedy of specific performance, each of the security interests granted to Sallyport as identified under Section 3 of this Addendum constitutes a valid first priority security interest or lien in and to the Collateral, granting all rights and remedies to a secured party under the UCC, except as otherwise permitted hereunder.

4.8    Eligible Inventory.   All Eligible Inventory included in the Borrowing Base meets the criteria for Eligible Inventory.

4.9    Location of Collateral.   All of the Collateral is used or held for use by Seller at the locations as detailed in the attached Schedule 4.9, Schedule of Inventory Locations.

**SECTION 5.    CONDITIONS OF ADVANCES**

Sallyport may to extend credit hereunder, in its sole and absolute discretion, subject to the following being true and correct:

5.1    Representations and Warranties; Covenants.   At the date of each Advance, the representations and warranties set forth in Section 4 hereof and otherwise contained herein and the Seller Covenants set forth in Section 6 hereof shall be true and correct on and as of such date, with the same effect as though such representations and warranties and covenants had been made on and as of such date, except to the extent that such representations and warranties or covenants relate solely to an earlier date.

5.2    Certificates. On or before the date hereof, Sallyport shall have received from Seller (a) a copy of its certificate of company status and articles of formation with all amendments, certified by the Secretary of State of the state of Seller's formation; (b) the certificate of its secretary or assistant secretary, dated the date hereof and certifying that attached thereto is a true and complete copy of its charter documents prior to the adoption of the resolutions by its Board of Directors authorizing the execution, delivery and performance of this Agreement; and certification that its articles of formation have

EXHIBIT   D
Page   6   of   18

32

not been amended since the date of the last amendment thereof, if any, indicated on the certificate of the Secretary of State; and (c) such other documents as Sallyport may reasonably request.

5.3    No Default.  At the date of each Advance, no Event of Default, or event which with the giving of notice or of the passage of time, or both, would constitute an Event of Default, shall have occurred and be continuing.  Each request for an Advance shall constitute the confirmation by Seller that at the date thereof the conditions contained in this Section 5.3 shall have been satisfied.

## SECTION 6. BORROWER COVENANTS

From the date hereof and so long as the Inventory Loan shall remain outstanding, Seller shall undertake and covenants as follows:

6.1    Existence and Properties.  To the extent that the same are necessary for the proper and advantageous conduct of its business, Seller shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its entity existence, rights, licenses and permits and comply with all laws and regulations applicable to it and conduct and operate its business in substantially the manner in which it is presently conducted and operated.

6.2    Insurance.  Seller shall have and maintain with financially sound and reputable insurers, insurance satisfactory in all respects to Sallyport of the types and amounts customarily carried in Seller's line of business, including, without limitation, fire, public liability, theft, product liability, property damage and workers' compensation and such other risks as Sallyport may reasonably require, such insurance to be carried with companies and in amounts satisfactory to Sallyport, in its reasonable discretion, and Seller shall deliver to Sallyport from time to time as Sallyport may request, schedules setting forth all insurance then in effect and copies of the policies covering the Collateral, including standard extended coverage in an amount at least equal to the value of the Collateral.  Policies evidencing any such property insurance shall contain a standard loss payee provision providing for payment of any loss to Sallyport and shall provide for a minimum of thirty (30) days prior written notice to Sallyport of any cancellation.  At any time after the occurrence of an Event of Default or the occurrence of an event which with the giving of notice or the passage of time, or both, shall constitute an Event of Default, Sallyport may act as attorney-in-fact for Seller in obtaining, adjusting, settling, and canceling such insurance and endorsing any drafts representing payments of claims under such policies.  Seller hereby assigns to Sallyport all rights to receive proceeds of such insurance and directs any insurer to pay all proceeds directly to Sallyport, for application in Sallyport's sole discretion to the payment of the outstanding Obligations hereunder or to the restoration or repair of the Collateral. If Seller at any time fails to maintain the insurance required hereunder, Sallyport may purchase the same and charge Seller for such amount, which amount shall be payable upon demand, and if unpaid, shall constitute a secured Obligation hereunder. Seller shall furnish Sallyport with certificates or other evidence of compliance with these insurance provisions.

6.3    Obligations, Taxes and Laws.  Seller shall pay or cause to be paid all indebtedness and obligations promptly and in accordance with their respective terms, including, without limitation, sales, use and personal property taxes as the same may be imposed upon Seller from time to time, and pay and discharge or cause to be paid and discharged promptly all taxes, assessments, and governmental charges or levies imposed upon it or in respect of its property before the same shall become in default, as well as all lawful claims for labor, materials, and supplies or otherwise which, if unpaid, might become a Lien or charge upon such properly or any part thereof, and timely comply with all applicable laws and governmental rules and regulations; *provided, however,* that Seller shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge, Lien or claim, or timely comply with the laws and governmental rules so long as the validity thereof shall be properly reserved for in accordance with GAAP and contested by appropriate legal proceedings timely initiated and conducted in good faith.

6.4    Audits.  Seller shall at all times keep accurate and complete books, records and accounts of all of Seller's business activities, prepared in accordance with GAAP, and Seller shall permit Sallyport, or any persons designated by Sallyport, at any reasonable time, to inspect, audit and examine such books, records and accounts and to make copies or extracts thereof at the sole expense of Seller, which expense shall be an Obligation hereunder.  In addition, Sallyport shall have the right to conduct an

EXHIBIT  D
Page  7  of  18

33

examination and verification of Seller's financial, accounting and business records and supporting documents by an employee of Sallyport or a professional selected by Sallyport to verify the accuracy of such records (an "Audit") in each six (6) month period during the Term of this Agreement. In addition, Sallyport shall have the right to conduct an Audit upon i) an Event of Default; ii) a breach of the ASPA by Seller thereunder; iii) in order to protect Sallyport's security interest hereunder; or iv) a request by Seller to modify any terms or conditions of this Agreement. Sallyport shall be permitted to conduct an Audit upon 24 hours advance notice to Seller. Seller shall be responsible for all Audit costs and expenses, which shall be an Obligation hereunder.

6.5     Statements and Reports. Seller shall furnish to Sallyport:

(a)     at the time of each Notice of Borrowing: (i) a Borrowing Base Certificate in the form attached hereto as Exhibit A; and (ii) an inventory report of the complete and detailed description of all Inventory for period since last submission, which shall include movement of Inventory or an analysis of the Inventory stock; and

(b)     promptly, from time to time, such other information concerning the financial condition, business and affairs of Seller as requested by Sallyport in its sole discretion.

6.6     Financial Performance. Seller shall maintain a positive net worth.

6.7     Notices. Seller shall promptly notify Sallyport in writing of the occurrence of any Event of Default under any of the Financing Documents or any act or event which, with the giving of notice or the passage of time, or both, would be such an Event of Default and of any legal action, proceeding or investigation threatened or instituted against Seller that might have a material adverse effect upon the operations, financial condition or business of Seller or Seller's ability to repay the Inventory Loan, or Sallyport's security interest in the Collateral, and from time to time, at Sallyport's request, Seller will furnish to Sallyport a summary of the status of all such actions, proceedings or investigation.

6.8     Maintain Business. Seller shall maintain in full force and effect all licenses, permits, authorizations, bonds, franchises and other rights necessary or desirable to the profitable conduct of its business, shall continue in, and limit its operations to, the same general lines of business as are presently conducted and shall comply with all applicable laws, orders, regulations and ordinances of all governmental authorities, and, if a corporation or partnership, shall maintain its corporate or partnership existence.

6.9     Mergers, Sale of Assets. Seller will not, without Sallyport's prior written consent: (a) sell, lease, transfer or dispose of substantially all of its assets to another entity; or (b) consolidate with or merge into another entity, permit any other entity to merge into it or consolidate with it; or (c) permit any transfer of the ownership of, or power to control, Seller.

6.10     Dividends and Other Distributions. Seller will not, without Sallyport's prior written consent, declare, order, pay or make, directly or indirectly: (i) any dividend or other distribution on or on account of any equity interest in Seller; (ii) any management fee; (iii) any loans to equity holders of Seller; or (iv) any redemption, retirement, purchase or other acquisition of any equity interest of Seller now or hereafter outstanding.

6.11     Indebtedness. Seller will not, without Sallyport's prior written consent: (i) incur, create, assume or permit to exist any obligation or indebtedness, except (A) existing indebtedness disclosed on financial statements previously delivered to Sallyport, (B) the Inventory Loan, and (C) other indebtedness and trade obligations and normal accruals in the ordinary course of business not yet due and payable; or (ii) become liable, directly, or indirectly, as guarantor or otherwise, for any obligation of any other person or entity.

6.12     Inventory Records and Schedules. Seller shall maintain complete and accurate books and records regarding the Inventory, including records describing the dates of acquisition, acquisition costs, and serial or other identification numbers of the Inventory. Upon Sallyport's request, Seller shall provide Sallyport with complete and accurate schedules containing (a) a description of each item of



EXHIBIT D
Page 8 of 18

34

Inventory; (b) the serial number or other identification number, if any, of each item Inventory; and (c) such other information regarding the Inventory as Sallyport may reasonably require. Seller shall notify Sallyport in writing within five (5) business days of any Inventory which Seller acquires which is the subject of a Consignment Sale.

6.13    Inventory Location. Prior to causing or permitting any of the Inventory to be located on any premises in which any third party has an interest (whether as owner, mortgagee, beneficiary under a deed of trust, lien holder, or otherwise), Seller shall cause such third party to execute and deliver to Sallyport such consents, waivers and subordinations as may be reasonably necessary or appropriate, in Sallyport's discretion, to insure Sallyport that its security interest and rights in and to the Inventory are and shall at all times continue to be prior and superior to the rights of any such third party. No Inventory shall be stored with any warehouse operator or other third person without Sallyport's prior written consent and provided that the warehouse operator or other third person executes an agreement acceptable to Sallyport in its sole discretion which acknowledges Sallyport's security interest in the subject Inventory, provides that the Inventory will not be released or relocated without Sallyport's written consent and provides for other proper assurances that Sallyport may require under the circumstances. Seller shall not cause or permit any event to occur which would result in an early termination of any real property lease for any premises on which all or part of the Inventory now is or hereafter may be located.

6.14    Possession and Use of Inventory. Seller shall not sell, lease, transfer or otherwise dispose of any or all of the Inventory, except for the sale or lease of Finished Goods Inventory in the ordinary course of business. Seller shall not enter into any consignment sale unless Seller (i) notifies Sallyport in writing; (ii) the consignment sale purchaser executes an agreement acceptable to Sallyport in its sole discretion; and (iii) Seller properly perfects its security interest in the Inventory subject to the consignment sale.

6.15    No Liability by Sallyport for Inventory. Sallyport shall not be directly or indirectly liable or responsible in any way or under any circumstances to Seller or any other party (a) for the safe keeping of the Inventory; (b) any loss or damage to the Inventory occurring or arising in any manner from any cause; (c) any decrease in the value of the Inventory; or (d) any act or omission by any carrier, warehouse operator, bailee, forwarding agent, or other party dealing with all or part of the Inventory. Seller shall bear the entire risk of loss for all damage to and destruction of the Inventory.

6.16    Accounts. Seller acknowledges and agrees that all Seller Accounts shall be subject to, and in compliance with the terms and conditions of the ASPA.

6.17    Further Assurances. Seller shall take all actions which may be reasonably necessary or appropriate to maintain, preserve, protect, and defend the Collateral and Sallyport's security interest therein, including all such actions as may be reasonably requested by Sallyport. Upon Sallyport's request, Seller shall execute and deliver to Sallyport such further documents and agreements, in form and substance satisfactory to Sallyport, as Sallyport may reasonably require to effectuate this Addendum or to evidence, perfect, maintain, preserve or protect Sallyport's security interest in the Collateral, including financing statements, continuation financing statements, financing statement amendments, security agreements, and assignments.

## SECTION 7.    EVENTS OF DEFAULT

7.1    Events of Default. In addition to the occurrence of any the events described in Section 7 of the ASPA, the occurrence of one or more of the following events shall also constitute an Event of Default:

(a)    The ASPA is terminated for any reason, or Sallyport is no longer making Advances to Seller as set forth therein;

(b)    Any deterioration or impairment of the Collateral or any decline or depreciation in the value of the Collateral (whether actual or reasonably anticipated by Sallyport) which, in Sallyport's discretion, causes the character or value of the Collateral to become unsatisfactory to Sallyport; or

EXHIBIT _D_
Page _9_ of _18_

35

(c)　　Sallyport reasonably and in good faith believes that the Collateral is in danger of misuse, dissipation, commingling, loss, theft, damage or destruction, or is otherwise impaired or at risk of being impaired.

7.2.　　**Remedies of Sallyport Upon Default.** Sallyport shall have all of the rights and remedies of a secured party under the UCC and under all other applicable laws. At any time after any Event of Default has occurred, Sallyport may, without presentment, demand, protest or further notice of any kind (all of which are hereby expressly waived) and, notwithstanding the provisions contained in any other document or instrument executed or to be executed by Seller to Sallyport hereunder or contained in any other agreement, take any one or more of the actions as described in Section 7.2 of the ASPA or as described below:

7.2.1　　**Preparation of Collateral.** Sallyport may complete processing, manufacturing or repair all or any part of the Collateral prior to a disposition and, for such purpose and for the purpose of removal, Sallyport shall have the right to use Seller's premises, vehicles, equipment and all other property without charge. Sallyport may sell, ship, reclaim, lease or otherwise dispose of all or any part of the Collateral in its condition at the time Sallyport obtains possession of such Collateral or after further manufacturing, processing, or repair.

7.2.2　　**Time of Sale.** Without limiting the generality of this Section 7, Sallyport shall conclusively be deemed to have made a commercially reasonable disposition of any or all of the Collateral if (a) Sallyport holds a public or private sale of such Collateral at least ten (10) days after notice is given to Seller of the date fixed for any public sale or the date on or after which any private sale or other disposition of the Collateral is to be made by Sallyport; (b) with respect to any public sale, the sale is held at least ten (10) days after notice is published in a newspaper of general circulation in the county in which such Collateral is located; and (c) respect to any public disposition, the sale is held any time between the hours of 8 a.m. and 5 p.m. in the county in which such Collateral is located at any place designated by Sallyport.

7.2.3　　**Information.** Without limiting the generality of this Section 7, it shall conclusively be deemed to be commercially reasonable for Sallyport to direct any prospective purchaser of any or all of the Collateral to Seller to ascertain all information concerning the status of the Collateral.

7.2.4　　**Disposition.** Sallyport's disposition of any or all of the Collateral in any manner which differs from the procedures specified in this Section 7 shall not be deemed to be commercially unreasonable. It shall conclusively be deemed commercially reasonable if Sallyport sells any of the Collateral in a Consignment Sale.

7.2.5　　**Judicial Foreclosure.** Sallyport may reduce its claims for breach of any of the Obligations to judgment and foreclose or otherwise enforce its security interest in any or all of the Collateral by any available judicial procedure. If Sallyport has reduced its claims for breach of any of the obligations to judgment, the Lien of any levy which may be made on any or all of the Collateral by virtue of any execution based upon such judgment shall relate back to the date of Sallyport's perfection of its security interest in such Collateral. A judicial sale pursuant to such execution shall constitute a foreclosure of Sallyport's security interest by judicial procedure, and Sallyport may purchase at such sale and thereafter hold the Collateral free of all rights of Seller therein.

7.2.6　　**Discharge Claims.** Sallyport may discharge claims, demands, Liens, security interests, encumbrances and taxes affecting any or all of the Collateral and take such other actions as Sallyport determines to be necessary or appropriate to protect the Collateral and Sallyport's security interest therein. Sallyport, without releasing Seller or any other party from any of the Obligations, may perform any of the Obligations in such manner and to such extent as Sallyport determines to be necessary or appropriate to protect the Collateral and Sallyport's security interest therein.

7.2.7    <u>Credit or Consignment Sales</u>. In the event that, as a result of the disposition of any of the Collateral, Sallyport directly or indirectly enters into a credit transaction with any third party, Sallyport shall have the option, exercisable at any time, in its sole discretion, of either reducing Seller's obligation the principal amount of such credit transaction or deferring the reduction thereof until receipt by Sallyport of cash therefore from the third party. If Sallyport sells any of the Collateral in a Consignment Sale, Sallyport shall not reduce Seller's obligation until it's receipt of cash or good funds from the third party.

7.2.8    <u>Proceeds of Sale</u>. The proceeds of any sale or disposition of the Collateral by Sallyport shall be applied as provided in Section 7.3 of the ASPA.

7.2.9    <u>Liability for Deficiency</u>. Seller shall at all times remain liable for any deficiency remaining on the Obligations for which Seller is liable after any disposition of any or all of the Collateral and after Sallyport's application of any proceeds to the Obligations.

<u>7.3</u>    <u>Waivers</u>. Seller hereby waives presentment, demand for payment, protest, notice of demand, dishonor, protest and nonpayment, and all other notices and demands in connection with the delivery, acceptance, performance, default under, and enforcement of the Obligations. Seller waives the right to assert any statute of limitations as a defense to the enforcement of any of the Obligations to the fullest extent permitted by law.

<u>7.4</u>    <u>Actions</u>. Sallyport shall have the right, but not the obligation, to commence, appear in, or defend any action or proceeding which affects or which Sallyport determines may affect (a) the Collateral; (b) Seller's or Sallyport's rights or Obligations under the Financing Documents; (c) Seller's or Sallyport's rights under this Agreement; or (d) the Loan. Whether or not Seller is in default under the Financing Documents, Sallyport shall at all times have the right to take any and all actions which Sallyport in its good faith business judgment determines to be necessary or appropriate to protect Sallyport's interest in connection with the Loan.

## SECTION 8. GENERAL PROVISIONS

8.1    <u>Entire Agreement</u>. This Addendum, together with all other Financing Documents and the Recitals, Exhibits and Schedules referenced herein, constitutes the entire agreement of the Parties hereto and thereto, and relating to the subject matter hereof and is the final and complete expression of their intent and no prior agreement or understanding with respect to the Inventory Loans, whether written or oral, shall be of any further force or effect, all such other prior agreements and commitments having been superseded in their entirety by the Financing Documents. No prior or contemporaneous negotiations, promises, agreements, covenants, or representations of any kind or nature, whether made orally or in writing, have been made by the Parties, or any of them, in negotiations leading to this Addendum or relating to the subject matter hereof, which are not expressly contained herein, or which have not become merged and finally integrated into this Agreement; it being the intention of the Parties hereto that in the event of any subsequent litigation, controversy or Dispute concerning the terms and provisions of this Agreement, no Party shall be permitted to offer or introduce oral or extrinsic evidence concerning the terms and conditions hereof that are not included or referred to herein and not reflected in writing. No conditions exist to the legal effectiveness of this Addendum unless expressly set forth herein.

8.2    <u>Survival</u>. The representations and warranties and Seller' covenants hereunder shall survive the (a) closing of the Agreement; and (b) termination of this Addendum, and Sallyport may enforce such representations and warranties and covenants at any time. The indemnities of Seller shall survive repayment of the Inventory Loan and the termination of this Agreement.

8.3    <u>Relationship of Parties</u>. Seller acknowledges that the relationship under the Addendum is principally that of creditor and debtor and that there is not now, and Seller will at no time seek or attempt to establish, any fiduciary or confidential relationship of Sallyport to Seller. Seller waives any right to assert, now or in the future, the existence or creation of any fiduciary or confidential relationship of Sallyport to Seller in any action or proceeding, whether by way of claim, counterclaim, cross claim or otherwise.

EXHIBIT <u>D</u>
Page <u>11</u> of <u>18</u>

37

8.4     <u>Additional Instruments</u>. Each of the Parties shall from time to time, at the request of others, execute, acknowledge and deliver to the other Party any and all further instruments that may be reasonably required to give full effect and force to the provisions of this Agreement.

8.5     <u>Originals</u>. This Addendum may be executed in any number of counterparts, each of which so executed shall be deemed an original and constitute one and the same agreement. Facsimile copies with signatures shall be given the same legal effect as an original. Delivery of a manually executed copy of a signature page of this Addendum or any document ancillary thereto or executed pursuant to the transactions contemplated by this Addendum by facsimile or by electronic transmission of an portable document format file or equivalent (also known as a "PDF file") shall be effective as delivery of a manually executed original counterpart of this Agreement. An electronic signature of this Addendum or any document ancillary thereto or executed pursuant to the transactions contemplated by this Addendum shall be effective as delivery of a manually executed original counterpart of this Agreement, which electronic signature shall be defined as an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by Seller or any Person with the intent to sign the record.

8.6     <u>Interpretation.</u> In the event an ambiguity or question of intent or interpretation arises, the Addendum shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

8.7     <u>Construction</u>. The Parties have read this Addendum, understand its contents, and represent that each has full and complete authority to sign this Addendum and that the execution, delivery and performance hereunder has been duly authorized by each Party. Each of the Parties hereto has had an opportunity to consult with its respective legal counsel prior to executing this Addendum. In the event an ambiguity or question of intent or interpretation arises, this Addendum shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

8.8     <u>Incorporation by Reference to Provisions of the ASPA</u>. Any provision contained within the ASPA not otherwise inconsistent with the provisions covered herein shall be incorporated by reference and applicable to this Addendum as if fully set forth herein. Any provision in the ASPA that may be inconsistent with a provision of this Addendum shall first be interpreted in a common sense manner that makes it consistent with and applicable to this Addendum to the extent possible and if thereafter it is still inconsistent, such inconsistent provision from the ASPA shall not apply to this Addendum.

[signatures on the following page]

EXHIBIT D
Page 12 of 18

38

**In Witness Whereof,** the Parties hereto have caused this Revolving Inventory Loan Addendum to Account Sale and Purchase Agreement to be duly executed by their respective authorized officers as of the Effective Date.

| DON ROSE OIL CO., INC.<br>a California corporation | SALLYPORT COMMERCIAL FINANCE, LLC,<br>a Delaware limited liability company |
|---|---|
| By: _____<br>Name: _____<br>Title : _____ | By: _____<br>Name: _____NILL___HAEI_____<br>Title : ____PRESIDENT_____ |

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )
                                       ) ss.
COUNTY OF _____         )

On _____, before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____

Notary Public

EXHIBIT D
Page 13 of 18

39

**In Witness Whereof,** the Parties hereto have caused this Revolving Inventory Loan Addendum to Account Sale and Purchase Agreement to be duly executed by their respective authorized officers as of the Effective Date.

| DON ROSE OIL CO., INC.<br>a California corporation | SALLYPORT COMMERCIAL FINANCE, LLC,<br>a Delaware limited liability company |
|---|---|
| By: _____<br>Name: _____<br>Title : _____ | By: _____<br>Name: _____<br>Title : _____ |

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA          )
                                                )  ss.
COUNTY OF _Tulare_          )

On _2/6/2017_ , before me, _Shaukat N. Lokhandwala_ Notary Public, personally appeared _John DeLellis Castellucci_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SHAUKAT N. LOKHANDWALA
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2073427
TULARE COUNTY
My Comm. Exp. July 28, 2018

_____
Notary Public

EXHIBIT _D_
Page _14_ of _18_

40

## SCHEDULE 1.2

PERMITTED ENCUMBRANCES

41

## SCHEDULE 4.5

Schedule of Litigation

## SCHEDULE 4.9

Schedule of Inventory Locations

Location 1:
    205 North Ben Maddox Way
    Visalia, CA

Location 2:
    361 Terry Avenue,
    Visalia, CA

## EXHIBIT A

Borrowing Base Certificate

Company Name:     DON ROSE OIL CO., INC.

Date:

INVENTORY SUMMARY (Date of Valuation or Balance Sheet (_____)

Total Inventory Amount                        $_____

Less:   Non Eligible Inventory            $_____

Eligible Inventory Amount                 $_____

Advance Rate                         x_____%
(based on the lesser of 50% of Cost or 75% of the Net Orderly Liquidation Value

MAXIMUM INVENTORY LOAN AMOUNT          $600,000

less CURRENT PRINCIPAL BALANCE         $_____

Amount available to draw                 $_____
(not to exceed Maximum Inventory Loan Amount)

For purposes of securing credit from Sallyport Commercial Finance, LLC ("Sallyport"), we hereby certify that the above schedules are true, accurate, complete and correct. The Inventory identified above, together with certain other collateral, is assigned and pledged to Sallyport pursuant to that certain Revolving Inventory Loan Addendum to Accounts Sale and Purchase Agreement dated _____

DON ROSE OIL CO., INC.

By:_____
Name:
Its:



<u>**TERM LOAN ADDENDUM TO**</u>
<u>**ACCOUNTS SALE AND PURCHASE AGREEMENT**</u>

This Term Loan Addendum to Accounts Sale and Purchase Agreement (this "Term Loan Addendum"), is dated as of January 2, 2017 (the "<u>Effective Date</u>") by and between Sallyport Commercial Finance, LLC ("Sallyport"), a Delaware limited liability company with its principal place of business located at 14100 Southwest Freeway, Suite 210, Sugar Land, Texas 77478 and Don Rose Oil Co., Inc., a California corporation, whose office is located at 205 N. Ben Maddox Way, Visalia, CA 93292 (the "Seller"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Accounts Sale and Purchase Agreement ("ASPA") of even date herewith entered into between Sallyport and Seller.

This Term Loan Addendum is entered into between Seller and Sallyport in light of the following facts:

WHEREAS, Seller owes Sallyport amounts due for a term loan (the "Pre-existing Term Loan") made to Seller by Siena Funding LLC which Pre-existing Term Loan was assigned to and now owing to Sallyport.

WHEREAS, the parties hereto desire to amend and restate the terms of the Pre-existing Term Loan.

NOW, THEREFORE, Seller and Sallyport agree as follows:

1.  <u>Definitions</u>.  In addition to the definitions contained in the Agreement, the first paragraph of this Rider and in the recitals to this Rider, the following terms are specifically defined for use herein:

    1.1  "<u>**Event of Default**</u>" shall have the meaning set forth in Section 7.1 of the ASPA.

    1.2  "<u>**Term Loan**</u>" shall have the meaning set forth in <u>Section 2</u> of this Rider.

2.  <u>Term Loan</u>.  The Term Loan shall mean that certain loan in the principal amount of One Million One Hundred Fifty Thousand and no/100 Dollars ($1,150,000.00) that may be increased up to One Million Three Hundred Thousand and no/100 Dollars (1,300,000.00).

3.  <u>Interest on the Term Loan</u>.  The Term Loan shall bear interest at a rate of fifteen percent (15%) per annum on the principal balance outstanding.  Upon the occurrence of an Event of Default, the Term Loan shall be subject to the Default Interest Rate pursuant to the Agreement.

4.  <u>Term Loan and Interest Included in Obligations</u>.  The Term Loan, as well as all of the interest accrued thereon and fees related thereto, shall be deemed included in the "Obligations" and shall be secured by the Collateral pursuant to the terms of the Agreement; <u>provided</u>, that the proceeds of the Collateral shall be applied to all Obligations other than the Term Loan first before being applied to the Term Loan.

5.  <u>Payment Terms</u>.  The Term Loan shall be subject to the repayment terms contained in this Section.

    5.1  Seller shall repay the Term Loan, and the interest thereon, as follows:
        A.  Absent an Event of Default, on or before the end of the Original Term, Seller, shall pay to Sallyport interest accrued on the principal amount outstanding on the Term Loan of the first day of each month.

EXHIBIT E
Page 1 of 4

47

B.   If not sooner paid, absent an Event of Default, Seller shall pay to Sallyport the remaining outstanding principal balance of the Term Loan, together with all accrued and unpaid interest thereon on the last day of the Original Term.

5.2   Notwithstanding the provisions of Section 5.1 to the contrary, the outstanding principal balance of the Term Loan, and all accrued and unpaid interest thereon, will be immediately due and payable upon the termination of the Agreement, regardless of how such termination occurs.

6.   Voluntary Prepayment.   Seller may not prepay principal amounts outstanding on the Term Loan until all other Obligations due from Seller to Sallyport are first indefeasibly paid in full.

7.   Early Payment/Termination Premium.   In the event that the Agreement is terminated because of an Event of Default or Seller seeks to terminate the Agreement prior to the end of the Original Term, then in each such case, in addition to the payment of the subject principal amount and all unpaid accrued interest and other amounts due thereon, the Seller immediately shall be required to pay to Sallyport an Early Payment/Termination Premium (as liquidated damages and compensation for the cost of the Lender making the funds available under this Agreement with respect to such Term Loan during the scheduled term of this Agreement) in an amount equal to the Applicable Percentage (as defined below) of the amount of outstanding principal amount of the Term Loan. With respect to any such event, the "Applicable Percentage" shall be (i) 1.5%, if such event occurs on or before the first anniversary of the Agreement, (ii) 0.75% if such event occurs after the first anniversary of the Agreement but before the end of the Original Term. Borrower acknowledges and agrees that (x) the provisions of this paragraph shall remain in full force and effect notwithstanding any rescission by Sallyport of an acceleration with respect to all or any portion of the Obligations, (y) payment of any Early Payment/Termination Premium under this paragraph constitutes liquidated damages and not a penalty, and (z) the actual amount of damages to Sallyport or profits lost by Sallyport as a result of such early payment or termination would be impracticable and extremely difficult to ascertain, and the Early Payment/Termination Premium under this paragraph is provided by mutual agreement of Seller and Sallyport as a reasonable estimation and calculation of such lost profits or damages of the Seller and Sallyport.

8.   Conditions Precedent.   This Term Loan Addendum shall become effective upon execution and delivery by Seller this letter and the fully executed Agreement.

9.   Seller's Representations and Warranties.   Seller makes the following representations and warranties which shall be deemed to be continuing representations and warranties so long as this Term Loan remains in effect and until the Obligations have been repaid in full:

9.1   Due Authorization.   This Term Loan has been duly authorized by the Board of Seller and the officer(s) executing this Term Loan Addendum on behalf of Seller has been duly authorized to do so by the Board of Seller.

9.2   Binding Agreement.   This Term Loan Addendum is the valid, binding and legally enforceable obligation of Seller in accordance with its terms.

9.3   No Conflict.   The execution, delivery and performance by Seller of this Term Loan Addendum: (a) shall not constitute an event of default under any agreement, indenture or undertakings to which Seller is a party or by which Seller or any of its property may be bound or affected; (b) are not in contravention of or in conflict with any law or regulation; and (c) do not cause any lien, charge or other encumbrance to be created or imposed upon any such property by reason thereof.

10.   Binding Agreement.   This Term Loan Addendum shall be binding and deemed effective when executed by Seller and accepted and executed by Sallyport.

11.   Section Headings.   Section headings and section numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Term Loan Addendum.

EXHIBIT E
Page 2 of 4

46

12.    Interpretation.  Neither this Term Loan Addendum nor any uncertainty or ambiguity herein shall be construed or resolved against Sallyport or Seller, whether under any rule of construction or otherwise.  On the contrary, this Term Loan Addendum has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

13.    Severability.  Each provision of this Term Loan Addendum shall be severable from every other provision of this Rider for the purpose of determining the legal enforceability of any specific provision.

14.    Modification and Merger.  This Term Loan Addendum cannot be changed or terminated orally.  All prior agreements, understandings, representations, warranties and negotiations, if any, relating to the Pre-Existing Term Loan are merged into this Term Loan Addendum.

15.    Incorporation into Agreement.  This Term Loan Addendum and all of the terms, covenants, warranties, conditions, agreements and representations contained herein are incorporated into and deemed part of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Term Loan Addendum as of the date first hereinabove written.


**SALLYPORT**

SALLYPORT COMMERCIAL FINANCE, LLC

By:_____
Name:____NILES HART_____
Its:____PRESIDENT_____


*SELLER:*

DON ROSE OIL CO., INC.

By:_____
Name:_____
Its:_____


[Seller signature to be notarized]


2353-010.550085                                3                    Gifford's Market Term Loan Addendum

EXHIBIT E
Page 3 of 4

47

12.    Interpretation. Neither this Term Loan Addendum nor any uncertainty or ambiguity herein shall be construed or resolved against Sallyport or Seller, whether under any rule of construction or otherwise. On the contrary, this Term Loan Addendum has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

13.    Severability. Each provision of this Term Loan Addendum shall be severable from every other provision of this Rider for the purpose of determining the legal enforceability of any specific provision.

14.    Modification and Merger. This Term Loan Addendum cannot be changed or terminated orally. All prior agreements, understandings, representations, warranties and negotiations, if any, relating to the Pre-Existing Term Loan are merged into this Term Loan Addendum.

15.    Incorporation into Agreement. This Term Loan Addendum and all of the terms, covenants, warranties, conditions, agreements and representations contained herein are incorporated into and deemed part of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Term Loan Addendum as of the date first hereinabove written.

**SALLYPORT**

SALLYPORT COMMERCIAL FINANCE, LLC

By:_____
Name:_____
Its:_____

*SELLER:*

DON ROSE OIL CO., INC.

By:_____
Name:_____
Its:_____

[Seller signature to be notarized]

**DON ROSE OIL CO., INC.**
Estimated PROFIT/ LOSS and CASH FLOW for the period 6/23- 7/14/17

Prepared 6/22//17

| | CASE I | CASE II |
|---|---|---|
| Average Daily Advance By Sally Port | $ 93,247.93 | $ 230,047.93 |
| | | |
| **FUEL MARGIN** | | |
| BOB-TAIL | $ 0.4400 | $ 0.44 |
| TRUCK & TRAILER | $ 0.0900 | $ 0.09 |
| LUBE OIL MARGIN | $ 3.2600 | $ 3.26 |
| CARDLOCK | $ 0.3500 | $ 0.35 |
| Retail Propane | $ 2.3900 | $ 2.39 |
| PROPANE | $ 0.5200 | $ 0.52 |
| | | |
| **GALLONS For the Period** | | |
| BOB-TAIL | 200,000 | 200,000 |
| TRUCK & TRAILER | 500,000 | 1,700,000 |
| LUBE OIL | 3,850 | 3,850 |
| CARDLOCK | 32,500 | 32,500 |
| RETAIL PROPANE | 6,000 | 6,000 |
| PROPANE | 140,000 | 140,000 |
| TOTAL GALLONS | 882,350 | 2,082,350 |
| | | |
| **FUEL PRICE** | | - |
| BOB TAIL | $ 2.19 | 2.19 |
| TRUCK & TRAILER | $ 1.80 | 1.80 |
| LUBE OIL | $ 8.60 | 8.60 |
| CARDLOCK | $ 2.75 | 2.75 |
| RETAIL PROPANE | $ 2.85 | 2.85 |
| PROPANE | $ 1.18 | 1.18 |
| | | - |
| **DRO INCOME STATEMENT** | | - |
| REVENUE: | | - |
| BOB TAIL | 438,000 | 438,000 |
| TRUCK & TRAILER | 900,000 | 3,060,000 |
| LUBES, OIL & ADDITIVES | 33,110 | 33,110 |
| CARDLOCK | 89,375 | 89,375 |
| RETAIL PROPANE | 17,100 | 17,100 |
| PROPANE | 165,200 | 165,200 |
| PROPANE RENTALS | 5,000 | 5,000 |
| TOTAL GROSS REVENUE | 1,647,785 | 3,807,785 |
| | | |
| **COST OF SALES** | | |
| BOBTAIL | 350,000 | 350,000 |
| TRUCK & TRAILER | 855,000 | 2,907,000 |
| FUEL, OIL & LUBES | 20,559 | 20,559 |
| CARDLOCK | 78,000 | 78,000 |
| RETAIL PROPANE | 2,760 | 2,760 |
| PROPANE | 92,400 | 92,400 |
| | | - |
| | | - |
| | | - |
| **TOTAL COST OF SALES** | 1,398,719 | 3,450,719 |
| | | - |
| **GROSS PROFIT** | | - |
| BOBTAIL | 88,000 | 88,000 |
| TRUCK & TRAILER | 45,000 | 153,000 |
| FUEL, OIL & LUBES | 12,551 | 12,551 |
| CARDLOCK | 11,375 | 11,375 |
| RETAIL PROPANE | 14,340 | 14,340 |
| PROPANE | 72,800 | 72,800 |
| TIRES, BATTERIES & ACCESSORIES | | - |
| CA FEES | | - |
| GROSS PROFIT | 244,066 | 352,066 |
| | 14.8% | 9.2% |
| **OPERATING EXPENSES:** | | - |
| AMORTIZATION | | |
| BAD DEBTS | | - |
| BANK CHARGES | 1,000 | 1,000 |
| COMMISSIONS To Come | | - |
| DELIVERY GENERAL | 300 | 300 |

EXHIBIT F
Page 1 of 2

49

| | | |
|---|---:|---:|
| DEPRECIATION | | |
| EMPLOYEE BONUSES | | - |
| EQUIPMENT LEASE EXPENSE | 30,000 | 30,000 |
| FUEL | 12,000 | 20,000 |
| INSURANCE | 12,000 | 30,000 |
| INTEREST  Sally Port Fees | 30,000 | 30,000 |
| INTEREST ON EQUIPMENT | 10,000 | 10,000 |
| LOAN FEES | | - |
| OFFICE | 250 | 250 |
| OFFICE COMPUTER EXPENSE | 100 | 100 |
| EXCISE TAXES ON BIODIESEL | | - |
| OUTSIDE LABOR | 250 | 250 |
| PROFESSIONAL FEES (Legal and Accounting, DR Consulting, Other) | 27,000 | 27,000 |
| PROPERTY LEASE | 3,200 | 3,200 |
| PROPERTY TAXES | | - |
| TRUCK REPAIRS | 3,000 | 3,500 |
| SHOP SUPPLIES | 100 | 100 |
| TIRES - COMPANY USE | 500 | 800 |
| TANK TESTING FEES | | - |
| LICENSES - DMV | 3,000 | 3,000 |
| TAXES & LICENSES | 2,000 | 2,000 |
| UTILITIES | 2,400 | 2,400 |
| ALL OTHER EXPENSES | 1,825 | 1,825 |
| TOTAL EXPENSES | 138,925 | 165,725 |
| | | |
| SALARIES and WAGES: | | - |
| TRUCKING | 24,000 | 31,000 |
| OIL | 3,000 | 3,000 |
| PROPANE | 25,000 | 25,000 |
| OFFICE | 14,000 | 14,000 |
| OFFICER COMPENSATION  (Includes Four People) | 24,000 | 24,000 |
| PAYROLL TAX, WORK COMP & OTHER | 11,625 | 11,625 |
| | | - |
| TOTAL SALARIES & WAGES | 101,625 | 108,625 |
| | | |
| TOTAL SALARIES & EXPENSE | 240,550 | 274,350 |
| NET INCOME | 8,516 | 82,716 |
| | | |
| EBITDA | 48,516 | 122,716 |
| LESS | | - |
| PRINCIPAL PAYMENTS ON DEBT | | - |
| INTEREST PAYMENTS ON DEBT | (30,000) | (30,000) |
| INTEREST PAYMENTS ON EQUIPMENT | (10,000) | (10,000) |
| CASH PAID FOR CAP EX | - | - |
| REPAYMENTS OF ADVANCE FROM B MOORE | | - |
| NET PROCEEDS FROM SALE OF PROPANE | - | - |
| NET PROCEEDS FROM SALE OF BARITE MINE | | - |
| NET CASH (OUTFLOW) INFLOW | 8,516 | 82,716 |
| CUMULATIVE NET CASH FLOW (OUTFLOW) / INFLOW | $    8,516 | $    82,716 |

EXHIBIT E
Page 2 of 2

50